<pre>
1                  UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
2                       WACO DIVISION

3  JIAXING SUPER LIGHTING      ) Docket No. WA 20-CA-018 ADA
   ELECTRIC APPLIANCE CO.,     )
4  LTD., OBERT, INC.           )
                               )
5  vs.                         ) Waco, Texas
                               )
6  CH LIGHTING TECHNOLOGY      )
   CO., LTD., ELLIOTT          )
7  ELECTRIC SUPPLY, INC.,      )
   SHOAXING RUISING            )
8  LIGHTING CO., LTD.          ) May 7, 2021

9

10          TRANSCRIPT OF VIDEOCONFERENCE MOTION HEARING
              BEFORE THE HONORABLE ALAN D. ALBRIGHT

11

12  APPEARANCES:

13  For the Plaintiff:        Ms. Wendy Wang
                              Perkins Coie, LLP
14                            3150 Porter Drive
                              Palo Alto, California 94304
15
                              Mr. Matthew C. Bernstein
16                            Mr. Evan S. Day
                              Perkins Coie, LLP
17                            11452 El Camino Real, Suite 300
                              San Diego, California 92130
18

19  For the Defendant:        Mr. Cabrach J. Connor
                              Mr. Kevin S. Kudlac
20                            Connor, Kudlac, Lee, PLLC
                              609 Castle Ridge Road,
21                            Suite 450
                              Austin, Texas 78746
22

23

24

25
</pre>

1   **(Appearances Continued:)**

2   For the Defendant:          Mr. Jonathan Auerbach
                                Mr. Etai Lahav
3                               Mr. David C. Radulescu
                                Ms. Chunmeng Yang
4                               Radulescu, LLP
                                5 Penn Plaza, 19th Floor
5                               New York, New York 10001

6   Court Reporter:             Ms. Lily Iva Reznik, CRR, RMR
                                501 West 5th Street, Suite 4153
7                               Austin, Texas 78701
                                (512)391-8792

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Proceedings reported by computerized stenography,
     transcript produced by computer-aided transcription.

| | | |
|---|---|---|
| 13:31:35 | 1 | THE COURT:  Good afternoon, everyone.  Glad to be |
| 13:31:37 | 2 | back together. |
| 13:31:38 | 3 | THE CLERK:  Hi, Judge. |
| 13:31:41 | 4 | MR. KUDLAC:  Good afternoon, your Honor. |
| 13:31:42 | 5 | THE COURT:  Suzanne, if you would call the case, |
| 13:31:44 | 6 | please. |
| 13:31:44 | 7 | THE CLERK:  Court calls Waco Case 6:20-CV-18 -- I |
| 13:31:50 | 8 | am sorry.  I don't know how to pronounce that -- Jiaxing |
| 13:31:54 | 9 | Super Lighting Electric Appliance Company, Et Al vs. CH |
| 13:32:02 | 10 | Lighting Technology Company, Limited.  I apologize for |
| 13:32:04 | 11 | butchering that. |
| 13:32:04 | 12 | THE COURT:  Easy for you to say. |
| 13:32:07 | 13 | THE CLERK:  For motion hearing. |
| 13:32:08 | 14 | THE COURT:  If I could hear announcements from |
| 13:32:10 | 15 | plaintiffs' counsel, please. |
| 13:32:14 | 16 | MR. BERNSTEIN:  Good afternoon, your Honor. |
| 13:32:15 | 17 | Matt Bernstein from Perkins Coie.  I have with me |
| 13:32:18 | 18 | some colleagues from Perkins Coie, including Evan Day and |
| 13:32:21 | 19 | Wendy Wang, who will be arguing.  I also have some members |
| 13:32:23 | 20 | from my client, Super Lighting.  On the line, as well, |
| 13:32:28 | 21 | and, also, our co-counsel, ATIPM. |
| 13:32:31 | 22 | THE COURT:  Thank you very much.  And welcome to |
| 13:32:34 | 23 | your inhouse folks and your clients.  I appreciate them |
| 13:32:36 | 24 | attending. |
| 13:32:38 | 25 | Mr. Kudlac. |

| | | |
|---|---|---|
| 13:32:40 | 1 | MR. KUDLAC:  Good afternoon, your Honor. |
| 13:32:41 | 2 | Kevin Kudlac for defendants.  With me, I have |
| 13:32:46 | 3 | Cabrach Connor, David Radulescu, Etai Lahav, Chunmeng Yang |
| 13:32:50 | 4 | and Jonathan Auerbach. |
| 13:32:55 | 5 | MR. CONNOR:  Good afternoon, your Honor. |
| 13:32:57 | 6 | THE COURT:  Is that a different yellow tie or is |
| 13:32:59 | 7 | that -- |
| 13:33:01 | 8 | MR. KUDLAC:  Different yellow tie for you. |
| 13:33:03 | 9 | THE COURT:  I feel very special that you think |
| 13:33:05 | 10 | that to not have one but two yellow ties that you could |
| 13:33:08 | 11 | wear. |
| 13:33:09 | 12 | At any rate, I'm happy to take up whatever issues |
| 13:33:14 | 13 | you all have. |
| 13:33:16 | 14 | MR. KUDLAC:  Your Honor, I believe that there are |
| 13:33:18 | 15 | three pending motions that we briefly discussed or at |
| 13:33:21 | 16 | least identified last week, and those are defendants' |
| 13:33:25 | 17 | motion for leave to amend answers and counterclaims with |
| 13:33:28 | 18 | claims of unclean hands and inequitable conduct that is |
| 13:33:33 | 19 | ECF 73.  We also have a motion to strike final |
| 13:33:38 | 20 | infringement contentions, which is ECF 83, and a motion |
| 13:33:41 | 21 | for leave to amend final invalidity contentions, which is |
| 13:33:44 | 22 | ECF 85.  Those have been fully briefed and, your Honor, I |
| 13:33:50 | 23 | will be addressing all three, and I'm happy to start |
| 13:33:52 | 24 | wherever you would like.  I would submit that the motion |
| 13:33:55 | 25 | for leave to amend counterclaim might be the most prudent |

13:33:58  1  place to start.

13:34:00  2           THE COURT:  I always want to start with what's

13:34:02  3  most prudent, so let's do that.

13:34:04  4           MR. KUDLAC:  Thank you, your Honor.

13:34:04  5           This motion -- in this motion, your Honor, we

13:34:08  6  seek leave to amend our answers and counterclaims to

13:34:12  7  assert inequitable conduct and unclean hands with respect

13:34:15  8  to each of the eight patents-in-suit.  And the genesis of

13:34:20  9  this motion, your Honor, is -- stems from our efforts at

13:34:23  10  translating and analyzing the 140,000 pages that were

13:34:29  11  produced around Christmas Eve of last year, and as we

13:34:34  12  mentioned last week, the vast majority of those are in

13:34:37  13  Chinese language.  And so, that process took a while.

13:34:39  14           As part of that process, your Honor, what we

13:34:42  15  discovered was that plaintiffs had engaged in a

13:34:48  16  corporate-wide or systemic practice of, in the words of

13:34:52  17  their CEO, turning what is typically considered to be

13:34:56  18  unpatentable into patents.  And that thing that is

13:35:01  19  considered typically to be unpatentable is the work of

13:35:04  20  others that already exists and is being sold in the open

13:35:08  21  market.

13:35:09  22           What we discovered in poring over these thousands

13:35:13  23  and thousands of pages of documents is that plaintiffs had

13:35:16  24  engaged in a program of reverse engineering competitors'

13:35:21  25  LED tubes, extracting circuitry and designs and then,

| | | |
|---|---|---|
| 13:35:24 | 1 | filing patent applications using that information and |
| 13:35:28 | 2 | getting patents that cover those preexisting competitor |
| 13:35:32 | 3 | tubes. |
| 13:35:33 | 4 | When you combine those activities with the |
| 13:35:36 | 5 | directive from the CEO to patent what is unpatentable, |
| 13:35:40 | 6 | what you have is direct evidence of inequitable conduct |
| 13:35:44 | 7 | and unclean hands.  Now, your Honor, during this |
| 13:35:49 | 8 | painstaking process of uncovering this program, we found |
| 13:35:51 | 9 | that every one of the asserted patents is infected by this |
| 13:35:56 | 10 | prior art patenting process. |
| 13:35:57 | 11 | The details that we have discovered so far, and I |
| 13:36:03 | 12 | emphasize so far, which I'll come back to in a moment -- |
| 13:36:06 | 13 | the details we've uncovered so far is set forth in the |
| 13:36:08 | 14 | proposed amended pleading.  More than 150 pages of |
| 13:36:11 | 15 | detailed analysis of who, what, when, where and how, which |
| 13:36:17 | 16 | is all what is required, all required by the detailed |
| 13:36:21 | 17 | pleading requirements of inequitable conduct that forms |
| 13:36:25 | 18 | the basis of our claims or to be amended claims, your |
| 13:36:30 | 19 | Honor. |
| 13:36:30 | 20 | Two examples of the conduct that we discovered |
| 13:36:32 | 21 | are particularly enlightening as to the scope of this |
| 13:36:35 | 22 | practice.  The first example comes from the |
| 13:36:38 | 23 | reverse-engineering of a CREE LED tube, and this is |
| 13:36:41 | 24 | detailed in paragraphs 207 through 210 of the proposed |
| 13:36:45 | 25 | amended pleading.  In August of 2014, the plaintiffs |

13:36:50  1  created a reverse-engineering report on the CREE tube,

13:36:55  2  which include the details of a filament-simulating circuit

13:36:59  3  -- or stimulating circuit.  Those details included the

13:37:01  4  specific values of resistors and capacitors found in the

13:37:06  5  circuits controlling the operation of this CREE 2.

13:37:08  6        Two months later in October, plaintiffs filed a

13:37:11  7  Chinese patent application, one of their priority

13:37:14  8  applications that includes the filament-stimulating

13:37:16  9  circuit found in the CREE tube down to the matching

13:37:20  10  resistors and capacitors.  That Chinese patent application

13:37:24  11  is one of the priority documents for four of the patents

13:37:27  12  being asserted in the case.

13:37:28  13        Now, plaintiffs did not disclose the CREE tube,

13:37:31  14  nor the reverse-engineering, nor that the values of those

13:37:34  15  resistors and capacitors came from somebody else's design.

13:37:38  16  That reverse-engineering document from 2014 also included

13:37:42  17  circuit designs for a Philips prior art tube and Howard

13:37:47  18  LED tubes that were also copied and put into other patent

13:37:50  19  applications.

13:37:51  20        The second example, your Honor, comes from the

13:37:54  21  reverse engineering of what is called a Sunpark 2, and

13:37:58  22  this is detailed at paragraphs 228 through 258.  In this

13:38:03  23  instance, in about March of 2015, the plaintiffs

13:38:06  24  reverse-engineered a Sunpark LED tube and extracted

13:38:09  25  circuitry related to, among other things, what is called a

| | | |
|---|---|---|
| 13:38:12 | 1 | delay-start circuit that helps to improve the |
| 13:38:16 | 2 | compatibility of the LED tubes with older fluorescent tube |
| 13:38:20 | 3 | ballasts.  This reverse engineering revealed that the |
| 13:38:22 | 4 | Sunpark tube had a particular delay-start circuit that |
| 13:38:25 | 5 | included a particular pair of switches, a symmetrical |
| 13:38:30 | 6 | trigger diode, and a bidirectional triode thyristor, as |
| 13:38:35 | 7 | well as particular resistors of particular values. |
| 13:38:37 | 8 | Three weeks ago, employees of Super Lighting |
| 13:38:39 | 9 | submitted a conception document, including a delay-start |
| 13:38:43 | 10 | circuit that has the same two switches and the same |
| 13:38:46 | 11 | particular resistor value as the Sunpark tube.  That |
| 13:38:51 | 12 | delay-start circuit found its way into six out of the |
| 13:38:55 | 13 | eight of the asserted patents.  That Sunpark tube and |
| 13:38:59 | 14 | their reverse-engineering efforts were never disclosed to |
| 13:39:01 | 15 | the patent office.  Those are just a couple of examples. |
| 13:39:05 | 16 | They are more detailed in the amended pleadings, your |
| 13:39:08 | 17 | Honor.  But for a moment, if I could step back and go |
| 13:39:11 | 18 | through history of how we got here. |
| 13:39:13 | 19 | The original complaint was filed in January of |
| 13:39:16 | 20 | 2020 and listed four patents.  An amended complaint was |
| 13:39:20 | 21 | filed in March of 2020 and added four patents.  So we have |
| 13:39:24 | 22 | eight patents that are directed to specific circuitry and |
| 13:39:27 | 23 | designs and or -- of LED tubes.  Three days later, on |
| 13:39:34 | 24 | March 19th, the plaintiffs filed their -- served their |
| 13:39:37 | 25 | preliminary infringement contentions, which were all |

| | | |
|---|---|---|
| 13:39:40 | 1 | directed to CH-manufactured tubes, and they gave us their |
| 13:39:43 | 2 | priority claims for the eight patents.  And as you'll |
| 13:39:46 | 3 | recall, the eight patents among them list 70 or so |
| 13:39:50 | 4 | separate Chinese priority application documents. |
| 13:39:55 | 5 | Now, we've previously discussed the, at that |
| 13:39:58 | 6 | time, lack of production of conception and reduction to |
| 13:40:01 | 7 | practice documents.  But on December 24th of last year, we |
| 13:40:05 | 8 | received 10,000 documents of about 140,000 pages that were |
| 13:40:09 | 9 | all in Chinese.  And we began this painstaking process of |
| 13:40:12 | 10 | going through them, trying to apply them to the eight |
| 13:40:15 | 11 | patents and analyzing any of the prior art and reverse |
| 13:40:17 | 12 | engineering that we then had just gotten a peek into, and |
| 13:40:20 | 13 | it was then that we first got this look behind the |
| 13:40:23 | 14 | curtain, if you will. |
| 13:40:24 | 15 | When we combine that reverse engineering with the |
| 13:40:28 | 16 | stark absence of conception and reduction to practice |
| 13:40:31 | 17 | documents, we started to suspect, well, there's something |
| 13:40:33 | 18 | going on here.  And then, that's obviously not a fast |
| 13:40:37 | 19 | process for 140,000 pages and eight patents.  Then on |
| 13:40:41 | 20 | February 9th of this year, when Super Lighting served its |
| 13:40:44 | 21 | final infringement contentions, they changed their |
| 13:40:47 | 22 | inventorship story for five out of the eight asserted |
| 13:40:51 | 23 | patents.  What they did was, they identified different |
| 13:40:55 | 24 | priority applications for five of those asserted patents. |
| 13:40:58 | 25 | And that meant they backed up their date of conception or |

13:41:03   1   disclosure, or priority application, or priority, which

13:41:06   2   meant that what we had done on the same day, our final

13:41:09   3   invalidity contentions were premised on conception dates

13:41:13   4   or priority dates that they had just radically changed.

13:41:18   5          Now, this isn't just changing of dates.  It's

13:41:20   6   changing of an entire inventorship story.  And, for

13:41:24   7   example, for the 479 patent, which is one of the

13:41:27   8   delay-start patents that I mentioned, in their preliminary

13:41:32   9   infringement contentions, plaintiffs identified a priority

13:41:35   10  application from January of 2016, which name three

13:41:37   11  inventors.  When they served their final infringement

13:41:40   12  contentions, February 9th of this year, they dropped that

13:41:43   13  claim of priority and asserted an eight-month earlier

13:41:46   14  claim of priority to April 2015 to a different

13:41:50   15  application.

13:41:50   16         But that application didn't name any of the three

13:41:53   17  inventors from the originally claimed application;

13:41:56   18  instead, it named three different inventors and also

13:41:59   19  identified a fourth inventor as anonymous, a practice that

13:42:04   20  is apparently possible in China.  None of these inventors

13:42:08   21  are named on the 479 patent itself, which lists only two

13:42:11   22  inventors.

13:42:13   23         Notably, this earlier application was just weeks

13:42:17   24  after they had reverse-engineered the Sunpark tube with

13:42:20   25  the delay-start circuit.  There are other examples that

13:42:24  1  are detailed in our amended pleading where there are

13:42:28  2  several patents that have -- are directed to or have

13:42:31  3  claims of priority to Chinese patent applications with

13:42:35  4  inventors who are not listed on the resulting patents for

13:42:39  5  which they claim priority.

13:42:41  6          Now, I mentioned last week, the -- and earlier

13:42:46  7  today, the 70 different Chinese priority applications.  We

13:42:50  8  asked plaintiffs in a contention interrogatory to have

13:42:53  9  them identify the support in the priority applications for

13:42:56  10 the claimed inventions, and they responded on December

13:42:59  11 24th, at the same time they produced those 140,000 pages.

13:43:02  12 And their response was simply to give us the numbers of

13:43:05  13 the priority applications, the ones that they identified

13:43:07  14 in their preliminary infringement contentions, and then,

13:43:10  15 six weeks later, they changed them in their final

13:43:13  16 infringement contentions.

13:43:14  17         What we see here with all these changed

13:43:18  18 inventorship and priority claims, frankly, your Honor, it

13:43:23  19 amounts to a game of 70-card Monte.  Keep changing the

13:43:26  20 story and hiding things and making claims to priority

13:43:29  21 applications that they simply are not entitled to make

13:43:31  22 under the law.

13:43:33  23         I mentioned that our investigation continues,

13:43:36  24 your Honor.  And I would submit that our hearing last week

13:43:40  25 has already borne fruit, and your Honor's order has taken

13:43:43 1  effect and had an impact.  On May 2nd, plaintiffs produced

13:43:48 2  216 documents of about 5,500 pages, more than 200 of those

13:43:53 3  are conception-related documents of invention disclosures,

13:43:57 4  conception presentations, priority application filings,

13:44:00 5  and even four notebooks from one of the inventors on four

13:44:04 6  of the eight patents in the suit.

13:44:08 7        Couple of days later, a day later, on May 3rd,

13:44:10 8  the plaintiff produced another 192 documents and about

13:44:15 9  4,000 pages.  All are invention disclosure forms and other

13:44:20 10  conception-related documents.  They made another

13:44:21 11  production last night, and I'm sorry to say, your Honor,

13:44:24 12  that I can't tell you exactly what is in there.  Not yet,

13:44:27 13  anyway.

13:44:28 14        But suffice it to say, that given the fact that

13:44:30 15  the inventorship and priority and adequacy of disclosure

13:44:34 16  had been at issue since our original answer.  And the fact

13:44:38 17  that the amended pleading relies on documents and facts

13:44:41 18  that have been in plaintiffs' possession since long before

13:44:44 19  the filing of the case, there is no prejudice to the

13:44:46 20  plaintiffs in this case for allowing us to amend our

13:44:50 21  pleadings and to assert inequitable conduct and unclean

13:44:53 22  hands, based on this patent and practice that we have

13:44:57 23  discovered since they produced documents starting in

13:45:00 24  December of 2020.

13:45:02 25        Thank you, your Honor.

| 13:45:05 | 1 | THE COURT:  Mr. Bernstein. |

13:45:05    1          THE COURT:  Mr. Bernstein.

13:45:13    2          MR. BERNSTEIN:  My apologies, your Honor.  It's

13:45:15    3   going to be Ms. Wang arguing this.

13:45:17    4          THE COURT:  Very good.  Ms. Wang.

13:45:19    5          MS. WANG:  Hello, your Honor.  Good afternoon.

13:45:22    6   Wendy Wang on behalf of the plaintiff.

13:45:24    7          I will be addressing defendants' motion for leave

13:45:27    8   to amend answers and counterclaim.

13:45:29    9          THE COURT:  Ms. Wang, is this the first time

13:45:31   10   you've appeared in front of me?

13:45:34   11          MS. WANG:  No.  This is not the first time.  I

13:45:36   12   appeared on another case for the forum non conveniens

13:45:40   13   motion.  I don't know if you recall.

13:45:42   14          THE COURT:  I've had a few of those, but you're

13:45:45   15   certainly welcome back.  I did not recall that.  But I

13:45:49   16   just wanted to welcome you in my courtroom.  I appreciate

13:45:52   17   you being here.

13:45:53   18          MS. WANG:  Thank you so much.

13:45:56   19          So defendants' argument directly went into the

13:46:01   20   details of the inequitable conduct allegation, but the

13:46:04   21   prerequisite of their motion is a showing of diligence.

13:46:08   22   And this is the key flaw in defendants' motion.  This

13:46:12   23   motion was filed over two-and-a-half months late.  So

13:46:16   24   really, after the deadline, the motion for leave to amend

13:46:21   25   is the request to ask the Court to modify the scheduling

13:46:25   1   order.

13:46:26   2        And the Fifth Circuit sets forth four factors for

13:46:30   3   this type of motion to amend:  Diligence, the importance

13:46:33   4   of the amendment, prejudice to the nonmoving party, and a

13:46:38   5   continuance, whether that's necessary.  Among these four

13:46:42   6   factors, the most important factor is a showing of

13:46:45   7   diligence.  The law requires the moving party to show that

13:46:50   8   it could not reasonably have met the deadline, despite its

13:46:54   9   diligence.  But here, defendants cannot meet their burden

13:46:58  10   of showing diligence.

13:47:00  11        So I'm going to share my screen and show the

13:47:02  12   Court a timeline of relevant events.  Is the Court able to

13:47:23  13   see the timeline?

13:47:26  14        THE COURT:  Yes, ma'am.

13:47:27  15        MS. WANG:  Thanks.

13:47:30  16        So looking at the timeline, this case was filed a

13:47:33  17   year ago -- over a year ago, on January 10th of 2020.  The

13:47:40  18   privilege log shows that CH was aware of this litigation

13:47:45  19   ten days later and discussed with counsel, but CH avoided

13:47:51  20   service and did not accept service until ten months later,

13:47:56  21   shown here, November 12th, 2020.  So there was a ten-month

13:48:02  22   delay here.  And four days later, around the same time, on

13:48:06  23   November 16th, 2020, 18 of the 22 documents defendants

13:48:11  24   rely on in their motion were produced to defense counsel

13:48:15  25   in a parallel case in which defense counsel was

13:48:18  1   representing CH's interests.

13:48:21  2          And then, after CH finally accepted service, CH

13:48:26  3   appeared and served document requests.  And Super Lighting

13:48:30  4   produced essentially the same documents, 20 of the 22

13:48:35  5   documents, including the reverse-engineering report and

13:48:37  6   the prior art references at issue here, on November 24th,

13:48:43  7   2020.  So notably, November 24th was the first day when

13:48:49  8   the discovery responses were due.  So essentially Super

13:48:54  9   Lighting produced documents the same day they were due.

13:48:58  10          The deadline to amend pleadings was January 14th.

13:49:02  11  So to the extent defendants complained there was too short

13:49:07  12  of a time between December 24th and the deadline to amend

13:49:11  13  pleadings, it was a result of CH's own making.  They had

13:49:16  14  ten months before this to participate in this litigation,

13:49:21  15  to serve discovery requests, and to review documents that

13:49:23  16  they did not.

13:49:26  17          And also, we're looking at about a two-month

13:49:30  18  window where defense counsel were aware of those

13:49:34  19  documents, and they should have brought the motion before

13:49:37  20  the deadline.  Well, what if they couldn't meet the

13:49:42  21  deadline?  They could have asked the Court for an

13:49:45  22  extension, but they did not and they let the deadline

13:49:48  23  pass.

13:49:50  24          So around the same time, January 19, defense

13:49:55  25  counsel deposed a Single Lighting witness on the same

13:49:59  1   document in the parallel case.  So at that time,

13:50:04  2   defendants studied the documents, were aware of them, and

13:50:08  3   they should have brought the motion then, but they did

13:50:12  4   not.  It was not until March 25th.  It was two months --

13:50:17  5   over two months after the deadline that defendants finally

13:50:21  6   bring the motion to amend the counterclaim.

13:50:31  7        So also, I would like to address the change of

13:50:34  8   priority claims so that here, happened in February, early

13:50:40  9   February, that doesn't really have anything to do with the

13:50:43  10  underlying motion to amend to add inequitable conduct to

13:50:48  11  counterclaim because, again, defendants had those

13:50:51  12  documents at least as of December 24th, 2020.

13:50:58  13       So it's plaintiffs' position that the motion

13:51:01  14  should be denied for this reason alone because if you look

13:51:04  15  at the case law, diligence is the prerequisite.  If they

13:51:08  16  don't meet the diligence requirement, the motion should be

13:51:10  17  denied.  And we're one month away from the fact discovery

13:51:16  18  cutoff, and the Court should consider defendants'

13:51:18  19  repetitive delays in this case.

13:51:21  20       So initially, they had plenty of time, ten

13:51:25  21  months, to really show up and defend themselves and they

13:51:27  22  did not.  And as the Court knows, we appeared in front of

13:51:33  23  the Court last week about the request to schedule

13:51:39  24  depositions, among other things, and the parties will be

13:51:44  25  very busy conducting depositions in the next month.

| | |
|---|---|
| 13:51:47 | 1 |
| 13:51:52 | 2 |
| 13:51:55 | 3 |
| 13:51:59 | 4 |

1  Really, filing these fact-intensive, yet, baseless motions

2  late in the game really effectively delays the trial

3  schedule.  And plaintiffs respectfully request the Court

4  to deny defendants' motion.

5          So with respect to the materiality point, the

6  legal standard for inequitable conduct is that defendants

7  have to meet their burden to show plaintiffs' specific

8  intent to make a material misrepresentation or omission to

9  the PTO.

10         So the basis for the defendants' motion was the

11  reverse-engineering report and the prior art references in

12  those reverse-engineering reports.  But those -- as we

13  talked about, defendants knew about those references

14  before February 9th, but they did not chart most of these

15  references in their final invalidity contentions.  So if

16  they were material, defendants should have included them

17  in their final invalidity contentions.  So logically,

18  defendants conceded that these references are not

19  material.

20         And about the statement of patenting what's not

21  patentable, that doesn't come directly from the CEO.  It

22  was in Super Lighting's internal meeting notes created by

23  a staff member, and that doesn't really show any specific

24  intent to defraud the patent office.  While that

25  particular statement has multiple other interpretations,

| | | |
|---|---|---|
| 13:53:29 | 1 | but the heightened pleadings standard requires the |
| 13:53:32 | 2 | specific intent to defraud to be the single most |
| 13:53:36 | 3 | reasonable inference to be able to be drawn from the |
| 13:53:40 | 4 | evidence.  But this is not the case here. |
| 13:53:47 | 5 | So as to the third and the fourth factor, |
| 13:53:50 | 6 | prejudice, I already addressed that this is already late |
| 13:53:53 | 7 | in the game, and discovery will close in a month.  So |
| 13:53:57 | 8 | adding these claims really late in the game will be very |
| 13:54:01 | 9 | prejudicial and will drive up the cost of this litigation. |
| 13:54:06 | 10 | And on the fourth point, I guess both parties |
| 13:54:09 | 11 | agree that we don't need a continuance.  So we're, you |
| 13:54:13 | 12 | know, heading up to the depositions and we're getting |
| 13:54:15 | 13 | ready for trial.  So we don't need a continuance, and we |
| 13:54:19 | 14 | respectfully request the Court to deny the motion to |
| 13:54:23 | 15 | amend.  Thank you, your Honor. |
| 13:54:26 | 16 | THE COURT:  Let me ask you this.  If I were to |
| 13:54:29 | 17 | allow the motion to amend, are you saying you still don't |
| 13:54:32 | 18 | -- would not need any additional discovery?  And by that, |
| 13:54:37 | 19 | I mean the plaintiff. |
| 13:54:41 | 20 | MS. WANG:  Well, it's really defendants' motion |
| 13:54:43 | 21 | and they bear the burden of proof.  We would not need an |
| 13:54:48 | 22 | extension. |
| 13:54:51 | 23 | THE COURT:  Okay.  And maybe I'm missing this. |
| 13:54:57 | 24 | Mr. Kudlac, are you asking for an extension? |
| 13:55:02 | 25 | MR. KUDLAC:  We are not, your Honor. |

| | | |
|---|---|---|
| 13:55:03 | 1 | THE COURT: Okay. I thought that's what counsel |
| 13:55:05 | 2 | said. And I think she finished, so if you'd like to |
| 13:55:08 | 3 | respond, you're welcome to do so. |
| 13:55:10 | 4 | MR. KUDLAC: Yes, your Honor. |
| 13:55:11 | 5 | Briefly a few things. First, all three |
| 13:55:15 | 6 | defendants are seeking a continue -- are seeking to amend |
| 13:55:18 | 7 | their answers and counterclaims, not just CH -- not just |
| 13:55:23 | 8 | the Chinese-based defendants that did not appear until |
| 13:55:27 | 9 | late. And the lateness of appearance doesn't have |
| 13:55:29 | 10 | anything to do with this. As you'll recall, our Markman |
| 13:55:32 | 11 | hearing was approximately October 22nd, which means |
| 13:55:35 | 12 | discovery doesn't open until after that. |
| 13:55:37 | 13 | So we were diligent in getting discovery out. |
| 13:55:40 | 14 | And the fact that in a different proceeding with a |
| 13:55:45 | 15 | different protective order, we were exposed to |
| 13:55:49 | 16 | information, and the suggestion that we should have taken |
| 13:55:51 | 17 | that information and used it here is to tell us that we |
| 13:55:56 | 18 | should have violated a protective order and filed a motion |
| 13:55:59 | 19 | sooner. |
| 13:56:00 | 20 | As to diligence, your Honor, 140,000 |
| 13:56:05 | 21 | Chinese-language documents that were extraordinarily |
| 13:56:08 | 22 | technical and needed to be applied across eight different |
| 13:56:11 | 23 | patents. I think that, your Honor, common sense dictates |
| 13:56:15 | 24 | that takes time. It takes time not only from people that |
| 13:56:19 | 25 | can translate the documents but from people that can |

13:56:21   1   analyze the then-translated documents.

13:56:27   2          Another point, your Honor, they have failed to --

13:56:32   3   plaintiffs' counsel failed to address our amendment to

13:56:35   4   assert unclean hands, which is a different count and a

13:56:39   5   different requirement, different standard than inequitable

13:56:43   6   conduct.  And even on the inequitable conduct, we have

13:56:46   7   pled everything that we are required to plead.  We have

13:56:50   8   pled materiality, we have pled specific intent: and that

13:56:53   9   specific intent arises from at least the false

13:56:59   10  declarations by the inventors who are named on the

13:57:01   11  patents, who it is demonstrable did not invent the subject

13:57:07   12  matter claimed in those patents.

13:57:14   13         Finally, with respect to the -- again, one more

13:57:17   14  point on the diligence, your Honor.  They produced 140,000

13:57:20   15  Chinese-language documents on December 24th.  The deadline

13:57:23   16  to amend pleadings was January 14th.  The suggestion is

13:57:28   17  that we were -- we would be able to translate, analyze,

13:57:33   18  apply 7,000 pages a day.  You and I can remember, that's

13:57:40   19  more than two-and-a-half boxes of documents every single

13:57:45   20  day to eight -- across eight patents.

13:57:48   21         And the reference to the other proceedings also

13:57:52   22  points out -- I would point out, there are no overlapping

13:57:55   23  patents between that case and this case.  And with that,

13:57:59   24  your Honor, I think I have discussed everything.

13:58:04   25         THE COURT:  Thank you.

| | | |
|---|---|---|
| 13:58:06 | 1 | A response? |
| 13:58:07 | 2 | MS. WANG:  Thank you, your Honor. |
| 13:58:08 | 3 | So about the alleged violation of the protective |
| 13:58:12 | 4 | order, while it was the same party at issue here was Super |
| 13:58:18 | 5 | Lighting, the plaintiff, so defendants had those |
| 13:58:23 | 6 | documents.  They -- defense counsel had those documents |
| 13:58:25 | 7 | and they knew about them, and they took Mr. Zhon's |
| 13:58:30 | 8 | (phonetic) deposition, who is the Super Lighting witness |
| 13:58:32 | 9 | in that parallel case.  So essentially they had two months |
| 13:58:37 | 10 | to analyze those documents. |
| 13:58:39 | 11 | And really, the bottom line is if, you know, |
| 13:58:44 | 12 | you're trying to finish your homework, and if you can't do |
| 13:58:46 | 13 | it, you ask your professor whether you can get an |
| 13:58:48 | 14 | extension.  Sometimes you do, sometimes you don't, but you |
| 13:58:52 | 15 | need to ask.  Defendants did not really seek an extension |
| 13:58:55 | 16 | here and they let the deadline pass.  It's a court-set |
| 13:59:02 | 17 | deadline and the law says you have to show diligence, and |
| 13:59:05 | 18 | you should show that you could not reasonably have met the |
| 13:59:08 | 19 | deadline, despite your diligence.  And that is what |
| 13:59:12 | 20 | defendants' key flaw here is in the motion. |
| 13:59:19 | 21 | THE COURT:  Mr. Kudlac, any response to that? |
| 13:59:22 | 22 | MR. KUDLAC:  No, your Honor.  I think we've |
| 13:59:24 | 23 | detailed our diligence fairly well. |
| 13:59:26 | 24 | THE COURT:  Okay.  Let's move on, then, to the |
| 13:59:28 | 25 | next issue. |

13:59:31  1         MR. KUDLAC:  Your Honor, I would, with your

13:59:33  2  permission, go slightly out of order, at least with

13:59:35  3  respect to the ECFs, and turn next to the motion for leave

13:59:40  4  to amend our invalidity -- our final invalidity

13:59:45  5  contentions and that is ECF No. 85.  And, your Honor, this

13:59:55  6  also derives from the same, if you will, change of

14:00:02  7  invalidity -- or change of priority claims and the late --

14:00:06  8  or the production of documents in December of 2000.

14:00:11  9         What we had, as I detailed earlier, was a change

14:00:14  10 with respect to the priority dates for five of the eight

14:00:20  11 patents.  And the impact of that was, some of the prior

14:00:24  12 art that we had relied on, that we had charted in our

14:00:27  13 final invalidity contentions was based on the previous

14:00:30  14 claims from the preliminary infringement contention and

14:00:35  15 their responses to interrogatories in December of 2020.

14:00:39  16        So we relied on those original priority claims as

14:00:42  17 the date that we had to beat with our prior art.  And

14:00:46  18 then, on the date of their final infringement contentions,

14:00:48  19 they changed that.  They pulled the rug right out from

14:00:51  20 under us and we had to go -- we have to go back to the

14:00:53  21 drawing board on at least five of the eight patents.

14:00:57  22        And because these patents are interrelated, as

14:00:59  23 you know, strategically, because we're going to have to

14:01:02  24 reduce the number of references that we rely upon for

14:01:07  25 trial and they're going to have obviously reduced claims,

14:01:10 | 1 | we have to come up with a body of work, a body of prior
14:01:16 | 2 | art that can, as best as possible, span all of those eight
14:01:19 | 3 | patents.  And what we are trying to do here, your Honor,
14:01:21 | 4 | is simply respond to their changed priority claims with
14:01:26 | 5 | new charts and supplemented charts that are based on the
14:01:31 | 6 | information that we got from that December 2020 production
14:01:35 | 7 | and based on the changed priority claims as of February
14:01:40 | 8 | 9th of this year.
14:01:46 | 9 | THE COURT:  Were you done?
14:01:48 | 10 | MR. KUDLAC:  Yes, your Honor.  I think that
14:01:49 | 11 | summarized it.  You've heard all the other stuff before,
14:01:52 | 12 | so I didn't think I should go over that again.
14:01:54 | 13 | THE COURT:  I'm not sure who will be speaking on
14:01:55 | 14 | behalf of the plaintiff.  Ms. Wang or someone else?
14:01:58 | 15 | MS. WANG:  It will be me again, your Honor.
14:02:00 | 16 | Thanks.  I will share my timeline again.
14:02:16 | 17 | So again, before we get into the merits -- the
14:02:22 | 18 | substantive prior art references, again, the prerequisite
14:02:25 | 19 | is diligence as required by Fifth Circuit case law.  So
14:02:31 | 20 | here, as we just discussed, defense counsel had these
14:02:35 | 21 | documents as of November 16th.  And these documents are
14:02:40 | 22 | produced again in this case on December 24th, yet,
14:02:46 | 23 | defendants' motion for leave to amend the final invalidity
14:02:49 | 24 | contentions was even later.
14:02:52 | 25 | So as the Court can see, there was a four-month

14:02:59  1    delay for defendants to file their motion to amend the

14:03:04  2    invalidity -- final invalidity contentions.  And

14:03:08  3    defendants again used these documents in January.  So they

14:03:12  4    should have included these prior art references in their

14:03:16  5    final invalidity contentions on February 9th of 2020, but

14:03:21  6    they did not.

14:03:21  7         And also, on March 5th of 2021, defendants wrote

14:03:28  8    a letter to plaintiffs' counsel showing the first time

14:03:32  9    their intent to amend the final invalidity contentions.

14:03:37  10   And the parties had a meet-and-confer and as the Court

14:03:41  11   often expects the parties to do to work things out.  So we

14:03:44  12   told defendants' counsel, if you would like to add certain

14:03:48  13   references, please get back to us and let us know what you

14:03:51  14   would like to add and maybe we could work things out.

14:03:55  15   Then it was silent.  We didn't hear anything from defense

14:03:58  16   counsel until April 16th about this issue.

14:04:01  17        So defendants filed a motion to amend without

14:04:05  18   really telling us what prior art references they sought to

14:04:10  19   add.  So again, they didn't meet the burden to show

14:04:14  20   diligence.  There was no diligence.  The Court should deny

14:04:17  21   this motion based on that alone.

14:04:20  22        As to the change of priority claims, so again,

14:04:24  23   the change of priority doesn't change the fact that

14:04:27  24   defendants knew about these documents as of November 16th,

14:04:31  25   at least here in this case, December 24th as the

14:04:35  1   reproduction of these documents in this particular case.

14:04:39  2   And also, the priority claims for three of the eight

14:04:42  3   patents remained the same, so there's no basis for

14:04:46  4   defendants to amend the invalidity contentions on the

14:04:48  5   three patents.

14:04:50  6            And also, as a further illustration, this is on

14:04:54  7   page 7 of plaintiffs' opposition to defendants' motion to

14:04:59  8   amend the invalidity contentions.  So the old priority is

14:05:04  9   here and on February 9th, defendant -- plaintiff moves up

14:05:11  10  five of the eight patent priority claims.  So any diligent

14:05:16  11  prior art search previously would have necessarily covered

14:05:20  12  the prior art in this timeframe.

14:05:24  13           So with that -- and also, on the prejudice and

14:05:27  14  the continuation point, I think we addressed those, and we

14:05:29  15  don't need to repeat them here.  So the Court should deny

14:05:33  16  defendants' motion for leave to amend the invalidity

14:05:36  17  contentions.  Thanks, your Honor.

14:05:38  18           THE COURT:  I'm not sure I follow that -- keep

14:05:40  19  that screen up.

14:05:41  20           MS. WANG:  Yes.

14:05:42  21           THE COURT:  I'm not why -- are you saying that

14:05:45  22  the priority dates are so close that any search that would

14:05:49  23  have been done to find art for the old priority date would

14:05:53  24  have captured stuff for the new priority date, which is

14:05:58  25  earlier?

| | | |
|---|---|---|
| 14:05:59 | 1 | MS. WANG:  Yes.  Correct, because they were |
| 14:06:02 | 2 | called before that.  So it would be the reverse, right? |
| 14:06:04 | 3 | So if we have the old priority here, defendants would have |
| 14:06:09 | 4 | missed this period of prior art.  But here, we're moving |
| 14:06:14 | 5 | the new priority date earlier, which means their prior |
| 14:06:18 | 6 | search should have covered the entire time period. |
| 14:06:21 | 7 | THE COURT:  Yeah, but don't they now have to |
| 14:06:23 | 8 | start over and figure out what art -- I mean, I get what |
| 14:06:27 | 9 | you're saying, but if you think -- if you have the old |
| 14:06:33 | 10 | priority date and you're thinking okay, I've got these |
| 14:06:37 | 11 | three pieces of art that are killer pieces of art that |
| 14:06:41 | 12 | qualify under the old priority date and now that -- those |
| 14:06:45 | 13 | three have been killed by the movant back to new priority, |
| 14:06:51 | 14 | I get that they may have found the art, but, you know, |
| 14:06:58 | 15 | they might not have given it the same weighing or why |
| 14:07:01 | 16 | would they? |
| 14:07:02 | 17 | MS. WANG:  Yeah, that -- we acknowledge that. |
| 14:07:07 | 18 | But at least for the three patents that haven't been |
| 14:07:12 | 19 | changed the priority dates, there's no impact on that. |
| 14:07:19 | 20 | THE COURT:  Okay.  And I interrupted you.  Were |
| 14:07:21 | 21 | you done? |
| 14:07:22 | 22 | MS. WANG:  Yes.  Thanks, your Honor. |
| 14:07:26 | 23 | THE COURT:  Mr. Kudlac. |
| 14:07:27 | 24 | MR. KUDLAC:  May I respond briefly? |
| 14:07:29 | 25 | THE COURT:  Oh, of course. |

| 14:07:30 | 1 | MR. KUDLAC:  Thank you. |

14:07:30   1          MR. KUDLAC:  Thank you.

14:07:31   2          With respect to the documents from the other

14:07:34   3   case, the MaxLite case, if you will, we had asked in this

14:07:39   4   case if we could consider all of the documents that they

14:07:41   5   had produced in that case as cross-produced and

14:07:45   6   essentially come to a cross-use agreement.  They refused.

14:07:49   7   So this notion that we should have known or could have

14:07:51   8   used those documents is a red herring.

14:07:55   9          Your Honor was exactly right with respect to the

14:07:59  10   priority dates changing.  As your local rules require, we

14:08:04  11   were going to have to come down to certain number of

14:08:07  12   references or grounds that we could go forward at trial.

14:08:10  13   And so, when we did our preliminary and final invalidity

14:08:15  14   contentions, we had to pick and we did.  And then, the

14:08:20  15   ground changed beneath us, and that is the reason that we

14:08:23  16   should be allowed to amend, not just for the five but for

14:08:26  17   all eight, because of the interrelationship and the

14:08:30  18   limited use of prior art references, which is a trial

14:08:35  19   practicality matter, your Honor.

14:08:38  20          THE COURT:  You had me until you -- I'm not sure

14:08:43  21   why the dates should move for the three where the priority

14:08:49  22   date has not changed.

14:08:50  23          MR. KUDLAC:  It's because, one, the relationship

14:08:52  24   of the patents to each other and the fact that we're going

14:08:55  25   to have necessarily limited number of references or

14:08:59   1   grounds that we can assert at trial.  The calculus changes

14:09:04   2   with all of the priority date changes with respect to the

14:09:08   3   five because, say, for those five, we have to change which

14:09:12   4   references we have to use; then that increases the number

14:09:17   5   of references that we may have to use or changes them

14:09:20   6   dramatically with respect to those five, and thus limits

14:09:23   7   what we would be able to use for the other three.

14:09:25   8        But if some of those references that are new

14:09:28   9   references that we have to use because of the changed

14:09:31  10   priority for the five are just as good for those other

14:09:34  11   three, then strategically and practically, it would make

14:09:39  12   sense for us to add those references for those other three

14:09:42  13   that didn't have changed priority dates so that when we

14:09:45  14   get to expert reports and trial, we have fewer references

14:09:49  15   that we have to present to a jury, less confusion, more

14:09:53  16   streamlined.  That's the practical matter, your Honor.

14:09:58  17        THE COURT:  Any response to that, Ms. Wang?

14:10:03  18        MS. WANG:  Two responses.  First of all, we did

14:10:07  19   produce those documents used in the parallel case in the

14:10:11  20   Central District of California.  There was a month in

14:10:16  21   between; the reason is, it took coordination between two

14:10:19  22   law firms.  And also, more importantly, we asked

14:10:25  23   defendants in early March what art they would like to add,

14:10:30  24   and there was no response.  So this is not about, you

14:10:33  25   know, adding meritorious art.  And it was significantly

| | | |
|---|---|---|
| 14:10:37 | 1 | delayed so the Court should deny the motion. |
| 14:10:45 | 2 | THE COURT:  Any opinions to that?  Or do you want |
| 14:10:47 | 3 | to move on to the final issues? |
| 14:10:49 | 4 | MR. KUDLAC:  We can move on to the final issue, |
| 14:10:51 | 5 | which is the motion to strike a portion of the final |
| 14:10:54 | 6 | infringement contentions, your Honor. |
| 14:10:55 | 7 | THE COURT:  Okay. |
| 14:10:56 | 8 | MR. KUDLAC:  And this one will be even briefer, I |
| 14:11:00 | 9 | believe.  As your Honor knows, this case as it started off |
| 14:11:04 | 10 | was with respect to tubes that were exclusively |
| 14:11:09 | 11 | manufactured by CH and redistributed by Elliott.  But |
| 14:11:15 | 12 | exclusively products manufactured by CH.  And no other |
| 14:11:20 | 13 | products were named in the preliminary infringement |
| 14:11:23 | 14 | contentions. |
| 14:11:23 | 15 | A year later, when we get to the final |
| 14:11:25 | 16 | infringement contentions, the plaintiffs added tubes that |
| 14:11:29 | 17 | were manufactured by GE and ESL.  Not manufactured at all |
| 14:11:35 | 18 | by CH.  CH has nothing to do with them with respect to the |
| 14:11:40 | 19 | tubes that were identified in the final infringement |
| 14:11:43 | 20 | contentions.  Only CH -- or only Elliot had something to |
| 14:11:47 | 21 | do with them as a redistributor or reseller of those |
| 14:11:50 | 22 | tubes. |
| 14:11:50 | 23 | And so, we are now faced with a situation where |
| 14:11:55 | 24 | contrary to the other situation, CH doesn't have control |
| 14:12:00 | 25 | of or possession of the schematics other than the limited |

14:12:04  1  number of schematics that were apparently obtained by

14:12:08  2  reverse engineering by the plaintiffs and included in the

14:12:10  3  final infringement contentions.  We don't have any other

14:12:12  4  details other than potentially publicly available

14:12:15  5  information.

14:12:17  6          On top of that, the theories have changed.  These

14:12:21  7  are -- many of these patents are circuitry-related patents

14:12:24  8  and rely on particular chips that are in the accused

14:12:28  9  products.  The chips that are in the GE and ESL products

14:12:32 10  are different than the chips that are in the CH products.

14:12:36 11  And so, obviously, very difficult to get full

14:12:40 12  understanding of those products, and necessarily the

14:12:44 13  theories of infringement change because we're talking

14:12:46 14  about the operation of different products and circuitry

14:12:49 15  contained within different chips in those different

14:12:51 16  products.

14:12:53 17          As to diligence, your Honor, which we should look

14:12:58 18  at with respect to the plaintiffs here and why we didn't

14:13:01 19  have notice of these additional products earlier.  Their

14:13:06 20  explanation is, well, we didn't buy them until November

14:13:09 21  and we added them in February, and that's diligent.  I

14:13:13 22  mean, it only took us three months.  That's their

14:13:16 23  position.

14:13:16 24          But, your Honor, they could have purchased these

14:13:18 25  products more than a year before.  They could have

14:13:20  1  purchased them before they filed the case.  They could

14:13:23  2  have purchased them before they did their preliminary

14:13:26  3  infringement contentions, but they didn't.  And I submit

14:13:29  4  that was probably a strategic choice on their behalf,

14:13:33  5  given the vast size of their reverse-engineering efforts.

14:13:39  6  They could have and they didn't come forward and say we

14:13:42  7  didn't know about these products until November.  They

14:13:44  8  only said, we didn't buy them until November.

14:13:47  9       And I submit that the standard ought to be

14:13:49  10  determining diligence from when you knew about the

14:13:52  11  products and whether you were diligent about figuring out

14:13:54  12  whether they infringed.  They have said nothing in their

14:13:59  13  papers that they didn't know about these products.  They

14:14:02  14  didn't tell us anything about when they first found out

14:14:04  15  about these products.  All they told us was they first

14:14:07  16  purchased them back in November.  That, I submit, your

14:14:11  17  Honor, is not good enough.  That's not the standard.

14:14:16  18       So what we have is late-added products from

14:14:19  19  different manufacturers that are not parties and who have

14:14:21  20  not produced documents in this case yet.  They have been,

14:14:25  21  I understand, subpoenaed by the -- by the plaintiffs to

14:14:29  22  produce documents.  But it's my understanding that we have

14:14:31  23  not received those documents unless they were in the

14:14:34  24  documents that we just received last night.

14:14:36  25       So I submit this is the type of situation where

| | | |
|---|---|---|
| 14:14:39 | 1 | there has been no diligence.  They waited and sprung these |
| 14:14:42 | 2 | document -- these tubes on us on the last day to amend |
| 14:14:45 | 3 | their infringement contentions and have showed no |
| 14:14:48 | 4 | diligence in further -- or reason for their delay to add |
| 14:14:52 | 5 | them to the case.  Accordingly, your Honor, defendants |
| 14:14:56 | 6 | submit that the allegations against the GE and |
| 14:14:59 | 7 | ESL-manufactured tubes that have been added on the final |
| 14:15:03 | 8 | infringement contentions should be stricken. |
| 14:15:07 | 9 | THE COURT:  Anything else? |
| 14:15:09 | 10 | MR. KUDLAC:  No, your Honor.  Thank you. |
| 14:15:12 | 11 | THE COURT:  And anything else for the plaintiff? |
| 14:15:16 | 12 | MR. DAY:  Yes, your Honor.  Evan Day from Perkins |
| 14:15:19 | 13 | Coie for plaintiffs.  I'll be addressing this motion. |
| 14:15:21 | 14 | THE COURT:  Okay. |
| 14:15:21 | 15 | MR. DAY:  So, first of all, you know, as we |
| 14:15:24 | 16 | stated in our motion, Mr. Kudlac stated several times and |
| 14:15:28 | 17 | emphasized the word "exclusively."  There's never been -- |
| 14:15:30 | 18 | we've never stated anything like that.  I'm sure you're |
| 14:15:33 | 19 | aware, the naming of products in the complaint is |
| 14:15:37 | 20 | typically done on an exemplary basis in this district and |
| 14:15:42 | 21 | in most others. |
| 14:15:43 | 22 | Now, I don't think there is any dispute that the |
| 14:15:47 | 23 | number of products that are at issue in this motion are a |
| 14:15:50 | 24 | small fraction of the total number of products in this |
| 14:15:53 | 25 | case.  I think Mr. Kudlac emphasized that himself.  But, |

14:15:58  1  you know, I heard Mr. Kudlac talking about what the

14:16:03  2  standard ought to be.  And now, I don't want to argue

14:16:06  3  about what the standard is because I think the order

14:16:09  4  governing proceedings is fairly clear.

14:16:14  5       But we went based on what the order governing

14:16:17  6  proceedings actually says, and that order provides a final

14:16:22  7  infringement and invalidity deadline.  It has exactly the

14:16:26  8  same standard for both.  Now, we -- after serving the

14:16:30  9  initial contentions, which they are not raising any issue

14:16:34  10 with, but the preliminary contentions, we and Super

14:16:39  11 Lighting continued to investigate and identified

14:16:41  12 additional products that we believed needed to be torn

14:16:45  13 down, reverse-engineered; and based on those, we found

14:16:48  14 evidence of similar infringing features in those products.

14:16:56  15      And, you know, we were very diligent in preparing

14:17:00  16 our initial contentions, continued to research the issue

14:17:02  17 and found those additional products.  And our

14:17:07  18 understanding of the order governing proceedings is that

14:17:10  19 falls within what the order governing proceedings

14:17:13  20 contemplates.  And the defendants treated it exactly the

14:17:17  21 same way in their invalidity contentions.  Defendants'

14:17:21  22 final invalidity contentions added -- they added

14:17:25  23 additional products, they added additional patents.

14:17:26  24      And now, there is a response to that in the

14:17:30  25 defendants' reply, which I want to address briefly, and

14:17:34  1  there is a bit of an overlap between motions here.  But

14:17:38  2  one issue with -- one problem with their response, which I

14:17:43  3  think the defendants put in a footnote in their reply, is

14:17:47  4  that some of the added products had -- their response is

14:17:50  5  that, well, we added invalidity contentions because of new

14:17:52  6  production that they got from us.  Some of their added

14:17:56  7  products have nothing to do with that.

14:17:58  8         So, for example, there's an additional Keystone

14:18:00  9  product that's cited on -- that's cited in their

14:18:06  10  invalidity contentions that was newly added in the final

14:18:09  11  contentions.  So defendants treated this the same way.

14:18:11  12  Now, where there's an overlap between these motions is

14:18:15  13  that, you know, when Mr. Kudlac started talking about the

14:18:22  14  -- their motion to -- for leave to amend the complaint, he

14:18:25  15  started talking about the -- a Sunpark tube.

14:18:32  16         So if you'll give me a moment, your Honor.  And

14:18:40  17  if I can -- actually, I apologize.  I'm having difficulty

14:18:47  18  sharing my screen, but this is on page 8 of our -- on

14:18:58  19  Exhibit 5, which is the defendants' final invalidity

14:19:02  20  contentions served in -- they served back in February,

14:19:05  21  there's that Sunpark tube showing up.

14:19:07  22         So the problem with that for their diligence

14:19:12  23  argument on the motion for leave to amend the contentions

14:19:15  24  is that if they're saying it took us months to translate

14:19:19  25  all these Chinese documents, that why is this showing up

14:19:23  1  in our contentions in February?  They obviously knew about

14:19:25  2  this much earlier than they brought it to the Court.

14:19:28  3       So going back to the motion to -- going back to

14:19:32  4  their motion to strike, now, Mr. Kudlac spoke about

14:19:38  5  prejudice.  Now, the amount of time that was left to the

14:19:42  6  case when these were served, they had nearly five months

14:19:46  7  before their rebuttal infringement expert report would

14:19:50  8  have been due on to the original schedule and now that the

14:19:54  9  -- your Honor has moved the fact discovery deadline, the

14:19:58  10 parties have agreed on a -- an amended timeline for expert

14:20:02  11 reports that will put that -- their rebuttal expert report

14:20:07  12 on July 12th.  More than five months after those final

14:20:11  13 infringement contentions.  And we don't believe that

14:20:14  14 they've identified anything in their motion to say that

14:20:20  15 that's an adequate amount of time to prepare a defense to

14:20:23  16 this.

14:20:28  17      So the arguments that are being made here, you

14:20:31  18 know -- so, first of all, you know, how long does it take

14:20:34  19 to conduct a teardown?  And we identified two

14:20:36  20 representative products.  A lot of the others are simply

14:20:43  21 color temperature variations, you know, of the same

14:20:46  22 products.  So, you know, if you have a new iPhone that

14:20:48  23 comes out and has a -- you know, has a black case and a

14:20:53  24 silver case and a white case, you don't -- once you tear

14:20:57  25 down one of them, you don't need to tear down a different

14:20:59  1   color iPhone to see what the inside looks like.  And it's

14:21:02  2   the same way with these lamp tubes.

14:21:06  3        In addition to the argument about the responses

14:21:11  4   to the subpoenas that I understand is basically the only

14:21:16  5   explanation from defendants for why they waited more than

14:21:21  6   two months to file this motion, you know, almost two

14:21:25  7   months just to raise the issue with us at all and then,

14:21:30  8   another two weeks to file it, there's a lot of problems

14:21:32  9   with that.

14:21:32 10        And that just doesn't make sense to me having

14:21:34 11   been on that side of a case that, you know, as a

14:21:38 12   defendant, the ways that you respond to a plaintiffs'

14:21:43 13   case, you know, you don't wait for the plaintiff to get

14:21:46 14   documents from a third party.  That just doesn't make

14:21:49 15   sense.  You either poke holes in the evidence that they

14:21:51 16   have or you go out and look for your own evidence.

14:21:55 17        And they haven't submitted anything that says

14:21:56 18   that they couldn't go out -- you know, if they wanted to

14:21:59 19   present affirmative evidence to rebut our case, they

14:22:02 20   haven't presented anything that says they couldn't have

14:22:04 21   done it in the amount of time between when we served the

14:22:06 22   initial -- or, excuse me, when we served the final

14:22:11 23   infringement contentions and the close of fact discovery

14:22:12 24   or when expert reports would have been due.

14:22:16 25        And, you know, the other problem with relying on

14:22:20  1   the subpoenas to the GE and ESL is that that -- the

14:22:26  2   causation there runs both ways.  You know, it's not

14:22:29  3   uncommon for targets of subpoenas in litigation to drag

14:22:34  4   their feet a little bit.  I'd say, if anything, that's

14:22:36  5   more common than compliance on the earliest day.  But part

14:22:42  6   of the reason that both of these parties, GE and ESL, who

14:22:46  7   both now haven't produced technical documents, one of the

14:22:49  8   reasons that both of these parties gave was the fact that

14:22:51  9   defendants were planning to file this motion and the --

14:22:57  10  and as I explained in the declaration that's submitted

14:23:00  11  with our opposition, that -- we got that explanation from

14:23:03  12  both GE and ESL, even before defendants had filed their

14:23:08  13  motion.

14:23:10  14       So the result of that, of defendants waiting this

14:23:14  15  long to bring this issue to the Court and resolve it is,

14:23:18  16  it's interjecting confusion in the case not just for us

14:23:20  17  but for some of the third parties.  And finally, even if

14:23:26  18  we don't get -- you know, we certainly expect to get

14:23:29  19  technical documents from both GE and ESL, but if we don't,

14:23:33  20  you know, we have the burden of proof.  That's our

14:23:37  21  problem.

14:23:37  22       And if, you know, we think that there's other --

14:23:41  23  there's certainly other information that proves

14:23:42  24  infringement, mostly the teardowns because that is far and

14:23:46  25  away the most relevant evidence here.  But if we don't

| | | |
|---|---|---|
| 14:23:49 | 1 | have -- you know, if we don't have enough to prove it, |
| 14:23:51 | 2 | that's our -- you know, that's our problem.  It doesn't |
| 14:23:53 | 3 | make sense to argue that we have to wait for this motion |
| 14:23:57 | 4 | just to see how much evidence we have. |
| 14:24:00 | 5 | So in our view, in view of those things, in view |
| 14:24:04 | 6 | of the fact that the defendants were -- you know, that the |
| 14:24:09 | 7 | accused products are basically two series of tubes that |
| 14:24:13 | 8 | they've had half a year to look at and that they were not |
| 14:24:16 | 9 | diligent in bringing this motion, the plaintiffs |
| 14:24:19 | 10 | respectfully request the defendants' motion be denied. |
| 14:24:23 | 11 | THE COURT:  Any response? |
| 14:24:27 | 12 | MR. KUDLAC:  We found out about these tubes and |
| 14:24:29 | 13 | their allegations against these tubes in February, so I |
| 14:24:32 | 14 | have not a clue as to what Mr. Day is referring to when he |
| 14:24:35 | 15 | said we've had six months or half a year to look at these |
| 14:24:39 | 16 | tubes.  I think maybe he's just saying that we will have |
| 14:24:43 | 17 | had six months to look at them by the time we would serve |
| 14:24:48 | 18 | our rebuttal non-infringement reports. |
| 14:24:50 | 19 | To one of Mr. Day's points that apparently the |
| 14:24:54 | 20 | only difference amongst the newly accused tubes is color, |
| 14:25:01 | 21 | his comparison to the color of a casing of an iPhone is |
| 14:25:06 | 22 | rather dramatically inept.  The color that he's talking |
| 14:25:10 | 23 | about is the color that is generated by the LEDs and the |
| 14:25:14 | 24 | way that it generates what is put out for people to, I |
| 14:25:19 | 25 | don't know, read by. |

14:25:20  1          But it's not simply -- it's not the color of the
14:25:24  2  tube.  It's not whether the tube is red, white or blue.
14:25:28  3  It's the color of light that is generated by the circuitry
14:25:32  4  in the tubes themselves, and that has to do with the chips
14:25:38  5  that are in them and all of the LEDs that are in them, and
14:25:43  6  those are different than the previous products that are
14:25:46  7  manufactured by CH that they had previously accused.
14:25:50  8          Finally, your Honor, the time for diligence isn't
14:25:56  9  with respect -- necessarily with respect to us bringing
14:25:59 10  the motion.  And I submit that we were diligent in
14:26:02 11  bringing the motion as we were doing meet-and-confers,
14:26:05 12  many, many, meet-and-confers over the last couple of
14:26:07 13  months.  But the time for diligence was with respect to
14:26:10 14  the plaintiffs amending their infringing contentions.  And
14:26:14 15  there was a year that went by before they -- or nearly a
14:26:18 16  year that went by before they amended their invalidity --
14:26:21 17  or infringement contentions, and that was merely by the
14:26:24 18  filing of their final infringement contentions.
14:26:27 19          They did -- they never supplemented nor amended
14:26:31 20  them in that 11-month span.  And we still have not heard
14:26:36 21  when Super Lighting or plaintiffs' counsel first found out
14:26:41 22  about these tubes.  So I submit that they have not
14:26:45 23  demonstrated diligence in amending their infringement
14:26:50 24  contentions to add these tubes from other manufacturers,
14:26:53 25  and the allegations against them should be stricken.

14:26:56  1  Thank you, your Honor.

14:27:06  2          THE COURT:  I'm sorry.  A response?

14:27:08  3          MR. DAY:  Just very briefly.  I do want to

14:27:11  4  clarify that, yes, you know, we're including the time that

14:27:14  5  has passed since we served the final contentions and the

14:27:17  6  time that defendants still have to respond with respect

14:27:21  7  to, you know, whether there's adequate time for them to --

14:27:26  8  defendant to prepare a response.

14:27:27  9          And I would add that we informed them these

14:27:30  10 products were going to be at issue on the first day of

14:27:33  11 fact discovery in November.  And nothing further on that

14:27:38  12 from plaintiffs.

14:27:41  13         THE COURT:  Mr. Kudlac, anything else?

14:27:45  14         MR. KUDLAC:  No, your Honor.  Thank you.

14:27:46  15         And, Mr. Day, thank you for that clarification.

14:27:48  16         THE COURT:  Anything else we need to take up?

14:27:53  17         MR. KUDLAC:  I am not aware of anything, your

14:27:54  18 Honor, but I would -- I should listen to my co-counsel out

14:27:58  19 there just to make sure I don't mess up again.

14:28:02  20         MR. RADULESCU:  You didn't mess up at all the

14:28:04  21 record today.

14:28:06  22         MR. KUDLAC:  Thank you, sir.

14:28:09  23         THE COURT:  At least he didn't say "for a change"

14:28:11  24 at the end of that.  So very well done.

14:28:15  25         Anything else from counsel for plaintiff?

14:28:21  1          MR. BERNSTEIN:  Nothing, your Honor, for the

14:28:23  2   plaintiffs.

14:28:23  3          THE COURT:  Okay.  Very good.

14:28:25  4          I will work on this over the weekend and early

14:28:27  5   next week, and we'll get something out to you very early

14:28:30  6   next week.  We'll get rulings on these made so that you

14:28:32  7   all know what you're doing.  I definitely want to take the

14:28:36  8   time to think about these issues and not just rule on them

14:28:39  9   off the top of my head.  But I very much appreciate the

14:28:43  10  arguments that were made and the quality of the lawyers

14:28:46  11  that were -- that this week come.  As usual, patent cases

14:28:52  12  tend to have lawyers that are truly exceptional in the way

14:28:56  13  they handle things.  This was no different.

14:28:58  14         Have a good weekend.  Be safe out there.  And

14:29:01  15  we'll get something to you -- what we may very well do is

14:29:06  16  get you essentially a -- sort of just a -- maybe a gavel

14:29:13  17  ruling on them, and if we feel like we need to do anything

14:29:15  18  additional in terms of justification, or an order, or

14:29:19  19  something we want the public to see, we'll get to work on

14:29:21  20  that and get that out a little bit later.  Because I know

14:29:25  21  with where you all are at, time is of the essence.  So we

14:29:28  22  will get -- we will get you rulings very early next week.

14:29:32  23  It may not be as robust an order as maybe coming later in

14:29:36  24  time.

14:29:36  25         Take care, everyone.  Be good.  Thank you.



14:29:40  1           MR. RADULESCU:  Thank you, your Honor.

14:29:41  2           MS. WANG:  Thank you, your Honor.

        3           MR. BERNSTEIN:  Thank you, your Honor.

        4           (Proceedings concluded.)

1                        * * * * * *

2

3

4   UNITED STATES DISTRICT COURT  )

5   WESTERN DISTRICT OF TEXAS)

6

7      I, LILY I. REZNIK, Certified Realtime Reporter,

8   Registered Merit Reporter, in my capacity as Official

9   Court Reporter of the United States District Court,

10  Western District of Texas, do certify that the foregoing

11  is a correct transcript from the record of proceedings in

12  the above-entitled matter.

13     I certify that the transcript fees and format comply

14  with those prescribed by the Court and Judicial Conference

15  of the United States.

16     WITNESS MY OFFICIAL HAND this the 23rd day of May,

17  2021.

18

19

20                            /s/Lily I. Reznik
                              LILY I. REZNIK, CRR, RMR
21                            Official Court Reporter
                              United States District Court
22                            Austin Division
                              501 W. 5th Street,
23                            Suite 4153
                              Austin, Texas 78701
24                            (512)391-8792
                              SOT Certification No. 4481
25                            Expires:  1-31-23