IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| JIAXING SUPER LIGHTING ELECTRIC APPLIANCE CO., LTD. AND OBERT, INC., | § § § | |
| | § | Case No. 6:20-cv-00018-ADA |
| Plaintiffs, | § | |
| | § | |
| v. | § | JURY TRIAL DEMANDED |
| CH LIGHTING TECHNOLOGY CO., LTD., ELLIOTT ELECTRIC SUPPLY INC. AND SHAOXING RUISING LIGHTING CO., LTD., | § § § § | PUBLIC VERSION |
| | § | |
| Defendants. | § | |

**DEFENDANTS' MOTION TO EXCLUDE
CERTAIN OPINIONS AND TESTIMONY OF LAUREN KINDLER**

**CONTAINS MATERIAL DESIGNATED AS
HIGHLY CONFIDENTIAL:  ATTORNEYS' EYES ONLY**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   LEGAL STANDARD......................................................................................... 1

III.  STANDARD OF REVIEW ................................................................................ 5

IV.   ARGUMENTS .................................................................................................... 5

   A.   KINDLER'S LOST PROFITS ANALYSIS IGNORES PRINCIPLES OF
   CAUSATION REQUIRED. ................................................................................ 5

      i.    Kindler's Application of the Market Share Approach is Unreliable. ...................... 6

      ii.   Kindler Fails to Establish Super Lighting's Manufacturing Capacity and
      Capability................................................................................................................... 9

      iii.  Kindler Fails to Establish Super Lighting's Marketing Capability to Generate
      Sales to New Customers.......................................................................................... 10

      iv.   Kindler Assumes Price Erosion with No Supporting Analysis............................... 11

   B.   KINDLER'S REASONABLE ROYALTY INDICATORS OF VALUE ARE
   UNRELIABLE. .................................................................................................. 12

███
███

   C.   THE COURT SHOULD EXCLUDE KINDLER'S OPINIONS THAT ARE BASED
   EXCLUSIVELY ON INTERVIEWS WITH SUPER LIGHTING'S PERSONNEL. ..... 17

V.   CONCLUSION................................................................................................... 21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
    377 U.S. 476 (1964) ................................................................................5

*Atl. Specialty Ins. Co. v. Porter, Inc.*,
    742 F. App'x 850 (5th Cir. 2018) ..............................................................5

*Cedar Lodge Plantation, L.L.C. v. CSHV Fairway View I, L.L.C.*,
    753 F. App'x 191 (5th Cir. 2018) ..........................................................3, 5

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ......................................................................... *passim*

*Deimer v. Cincinnati Sub-Zero Prods., Inc.*,
    58 F.3d 341 (7th Cir. 1995) ......................................................................2

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ..........................................................................2, 3, 4

*Guillory v. Domtar Indus., Inc.*,
    95 F.3d 1320 (5th Cir. 1996) ....................................................................4

*Hathaway v. Bazany*,
    507 F.3d 312 (5th Cir. 2007) .................................................................2, 3

*Knight v. Kirby Inland Marine Inc.*,
    482 F.3d 347 (5th Cir. 2007) ....................................................................2

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) .............................................................................2, 5

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) ...............................................................12

*Marine Travelift, Inc. v. Marine Lift Sys., Inc.*,
    No. 10-C-1046, 2013 WL 3289076 (E.D. Wis. June 28, 2013) ........................18, 19

*Mentor Graphics Corp. v. Eve-USA, Inc.*,
    851 F.3d 1275 (Fed. Cir. 2017) .............................................................5, 6

*MGM Well Servs., Inc. v. Mega Lift Sys., LLC*,
    No. CIV.A. H-05-1634, 2007 WL 150606 (S.D. Tex. Jan. 16, 2007) .................18, 19

*NetAirus Techs., LLC v. Apple, Inc.*,
    No. LACV1003257JAKEX, 2013 WL 11237200 (C.D. Cal. Oct. 23, 2013) ........................12

*Orthoflex, Inc. v. ThermoTek, Inc.*,
    986 F. Supp. 2d 776 (N.D. Tex. 2013) ..............................................................................18, 19

*Pipitone v. Biomatrix, Inc.*,
    288 F.3d 239 (5th Cir. 2002) ...................................................................................................4, 5

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010)...................................................................................................12

*Ruiz-Troche v. Pepsi-Cola of Puerto Rico*,
    161 F.3d 77 (1st Cir. 1998).............................................................................................................4

*St. Martin v. Mobil Expl. & Producing U.S., Inc.*,
    224 F.3d 402 (5th Cir. 2000) ...................................................................................................4, 5

*Stinson Air Ctr., LLC v. XL Speciality Ins. Co.*,
    No. CIV. SA-03-CA-61-FB, 2005 WL 5979096 (W.D. Tex. July 8, 2005) ....................17, 19

*U.S. v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ..................................................................................................3

*U.S. v. Fullwood*,
    342 F.3d 409 (5th Cir. 2003) ......................................................................................................2

*Uniloc USA Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011)..................................................................................................12

*Verisign, Inc. v. XYZ.com LLC*,
    848 F.3d 292 (4th Cir. 2017) ...................................................................................................8, 9

**Statutes**

35 U.S.C. Section 284....................................................................................................................5

**Other Authorities**

Federal Rules of Evidence Rule 702.......................................................................................1, 1, 3

Defendants CH Lighting Technology Co., Ltd, and Shaoxing Ruising Lighting Co., Ltd, (collectively, "CH"), Elliott Electric Supply Inc. ("Elliott") (CH and Elliott, collectively are "Defendants"), pursuant to Rule 702 of the Federal Rules of Evidence, moves to exclude certain opinions and testimony of Lauren Kindler ("Kindler"), who Plaintiffs Jiaxing Super Lighting Electric Appliance Co., Ltd., and Obert, Inc. ("Super Lighting") disclosed as a damages expert, and to preclude Kindler from offering certain opinions at trial.

## I.      INTRODUCTION

Kindler's lost profit analysis is unreliable.[1] Her report relies on market share data that does not capture the market relevant to this litigation. Indeed, she admits that the market share data she uses for her analysis applies to North America as a whole, only contains Chinese exporters, and that the Super Lighting market share she references is the combined sales/market share for "Super" and ██████████████████████████████████████. In other words, Kindler's opinion is based on the wrong geography, artificially filters relevant market participants, and conflates Super Lighting with a non-party entity.  Additionally, Kindler's lost profit analysis is unreliable based on its faulty assumption that Super Lighting's data reflecting low line utilization necessarily shows that Super Lighting had the capacity to produce replacements for each accused product sold. Kindler's analysis is entirely devoid of the detail one would need to evaluate whether such capacity is even usable to meet increased demand for relevant products.

Kindler's royalty damages are similarly on shaky grounds. Kindler rests her royalty rate analysis on two Super Lighting licensing agreements, ████████████████████████████ ██████████████████████████████████████████████████████████████

---

[1] Attached as Exhibit 1 to this motion is a true and correct copy of Kindler's initial report (with only relevant exhibits to the report included).  All Exhibits to this Motion are attached to Robert Hill's Declaration. The Declaration and Exhibits are filed under seal pursuant to the protective order.

███████████████████████████████████████████████████. These

agreements are significantly different than the hypothetical negotiation in this case. ████████

███████ agreements cover Super Lighting's entire patent portfolio of more than 260 patents,

instead of only the eight patents in this case. Moreover, these agreements have a broader

geographic scope that would be at issue in the hypothetical negotiation. Kindler did not control for

these factors. Additionally, Kindler's royalty rate fails even a basic reasonableness test when

actually applied to relevant products.

In light of these considerations, as further explained below, Kindler's report and opinions

should be excluded.

## II.    LEGAL STANDARD

The admissibility of expert testimony is governed by Rule 702, which provides, in pertinent

part, that: "a witness who is qualified as an expert by knowledge, skill, experience, training or

education" may testify in the form of an opinion or otherwise if the testimony: (a) "will help the trier

of fact to understand the evidence or to determine a fact in issue"; (b) "is based on sufficient facts or

data" and (c) "is the product of reliable principles and methods" which (d) "the expert has reliably

applied . . . to the facts of the case." FED. R. EVID. 702. Thus, for proffered expert testimony to be

admissible, the witness must be adequately qualified to express an opinion on the matter in issue, the

expert's methodology must be reliable, and the testimony must assist the trier of fact in

understanding the evidence or in determining a fact in issue. *See, e.g.*, *Daubert v. Merrell Dow

Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Hathaway v. Bazany*, 507 F.3d 312, 317 (5th Cir. 2007).

The proponent of the challenged expert testimony bears the burden of demonstrating, by a

preponderance of the evidence, that the testimony satisfies the *Daubert* standard, *i.e.*, the

proponent of the challenged testimony must establish the qualifications, reliability, and helpfulness

of the challenged expert opinion. *U.S. v. Fullwood*, 342 F.3d 409, 412 (5th Cir. 2003).

2

In *Daubert*, the Supreme Court held that the district court must serve as a "gatekeeper" to ensure that expert testimony is both reliable and relevant. *Daubert*, 509 U.S. at 597, 598; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). In determining reliability, the court must make "a preliminary assessment of whether the reasoning or methodology underlying the [expert's] testimony is scientifically valid and . . . properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. *Accord Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). Reliability implies a grounding in the methods and procedures of science based on actual knowledge, not subjective belief or unsupported speculation: "Proposed [expert] testimony must be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. A court must exclude testimony based on "subjective belief" or "unsupported speculation." *Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 58 F.3d 341, 344 (7th Cir. 1995).

There must be an analytical connection between the facts of the case and the expert opinion offered. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). This "fit" between the facts and the expert's conclusions is not present when there is "too great an analytical gap between the data and the opinion offered." *Id.* In short, there must be a demonstrable connection between the facts and the opinions, and the expert's reasoning and methodology must be properly applied to the facts. *Daubert*, 509 U.S. at 592-93. The court may exclude opinion evidence "that is connected to existing data only by the *ipse dixit* ['he himself said it'; an assertion without supporting proof] of the expert." *Joiner*, 522 U.S. at 146. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Id.*; *see also U.S. v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004).

"The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" FED. R. EVID. 702 advisory committee's note (2000) (citation omitted). "[T]he existence of

sufficient facts and a reliable methodology is in all instances mandatory. Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Hathaway,* 507 F.3d at 318 (citations and internal quotation marks omitted). Thus, when assessing reliability, the court must focus "on [the experts'] principles and methodology, not on the conclusions that [the experts] generate." *Daubert*, 509 U.S. at 595. *Accord Cedar Lodge Plantation, L.L.C. v. CSHV Fairway View I, L.L.C.*, 753 F. App'x 191, 195 (5th Cir. 2018).[2]

   In undertaking the second part of its gatekeeping function, the court must assess whether the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact in issue, *i.e.*, whether it's relevant. *Daubert,* 509 U.S. at 591. *Accord Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 244-45 (5th Cir. 2002). The expert testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591. An expert opinion that is based on speculation or facts that are "indisputably wrong" is irrelevant and would not assist the trier of fact. *See, e.g.*, *Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996); *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998).

   If any of these requirements is not satisfied, the expert testimony should be excluded. *Daubert*, 509 U.S. at 589. The decision to exclude expert testimony is within the court's broad discretion. *See, e.g.*, *Joiner,* 522 U.S. at 146; *St. Martin v. Mobil Expl. & Producing U.S., Inc.,* 224

---

[2]     The Supreme Court articulated a non-exhaustive list of factors to be considered in deciding the question of reliability: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific theory; and (4) whether the theory is generally accepted in the scientific community. *Daubert,* 509 U.S. at 593-94. Ultimately, the expert must establish that his or her opinions "have a reliable basis in the knowledge and experience of his [or her] discipline." *Id.* at 592. This standard is satisfied only if the expert demonstrates that his or her opinions "have been arrived at in a sound and methodologically reliable fashion." *Ruiz-Troche v. Pepsi-Cola of Puerto Rico,* 161 F.3d 77, 85 (1st Cir. 1998). *Accord Daubert*, 509 U.S. at 590.

F.3d 402, 405 (5th Cir. 2000). Under this standard, Kindler's challenged opinions should be excluded.

## III.    STANDARD OF REVIEW

The district court's determination as to the admissibility of expert evidence under *Daubert* is reviewed for abuse of discretion. *See, e.g.*, *Kumho Tire*, 526 U.S. at 152; *Cedar Lodge Plantation*, 753 F. App'x at 195; *Atl. Specialty Ins. Co. v. Porter, Inc.*, 742 F. App'x 850, 853 (5th Cir. 2018); *Pipitone*, 288 F.3d at 243; *St. Martin*, 224 F.3d at 405. The court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence. *See, e.g.*, *Atlantic Specialty*, 742 F. App'x at 853.

## IV.    ARGUMENTS

## A.    KINDLER'S LOST PROFITS ANALYSIS IGNORES PRINCIPLES OF CAUSATION REQUIRED.

Kindler's lost profits calculation is fatally flawed for a number of reasons. Primarily, she fails to show a causal link between the profits alleged and CH's alleged infringement. Compensatory damages under 35 U.S.C. Section 284, which calls for damages adequate to compensate the plaintiff for its loss due to the defendant's infringement, should be treated no differently than the compensatory damages in other fields of law. *Mentor Graphics Corp. v. Eve-USA, Inc.*, 851 F.3d 1275, 1284 (Fed. Cir. 2017) (citing *Livesay Window Co. v. Livesay Indus., Inc.*, 251 F.2d 469, 471 (5th Cir. 1958) ("To allow a patent owner to recover lost profits from an infringer is no unique treatment of this one type of wrongdoing, and [it] is essentially the same problem which inheres in other instances of an interference with a valuable business right.")).  The "but for" damages the patentee must establish in patent law, as the Supreme Court explained, are an answer to a simply stated question: "[H]ad the Infringer not infringed, what would the Patent Holder-Licensee have made?" *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476,

507, (1964); *Mentor Graphics Corp.,* 851 F.3d at 1284.  The goal of lost profit damages is to place the patentee in the same position it would have occupied had there been no infringement. In this regard, lost profit patent damages are no different than breach of contract or general tort damages. Thus, the fact finder's job is to determine what would the patent holder have made (what would his profits have been) if the infringer had not infringed. *Mentor Graphics Corp.,* 851 F.3d 1285.

Kindler states that "there are three prongs to a lost profits damages evaluation: (a) whether a wrongful act has occurred; (b) whether a causal connection to lost profits exists; and (c) the quantification of lost profits to a reasonable degree of economic certainty." *See* Ex. 1, Kinder Report at ¶ 51.  Kindler's analysis fails prongs (b) and (c).

i.    **Kindler's Application of the Market Share Approach is Unreliable.**

Kindler states that "the second part of the 'four part approach set forth in *Panduit* for evaluating whether lost profits damages are appropriate in a patent infringement matter (from an economic perspective) generally involves determining that…(b) a causal connection exits to the lost profits suffered by the Plaintiff." *See* Ex. 1, Kinder Report at ¶ 51.  Kindler opines:

> "In the second Panduit factor, the economic casual connection between the defendant's infringement and the plaintiff's lost sales can be demonstrated by an absence of acceptable noninfringing alternatives. As adopted in *State Industries v. Mor-Flo Industries*, in the presence of competition from third-party companies, the economic casual connection between the defendant's infringement and the plaintiff's lost sales can be demonstrated through a market share allocation approach. Under this market share allocation approach, I understand that the defendant's infringing sales can be allocated to the plaintiff as lost sales in proportion to the plaintiff's market share in the relevant market relative to third-party competitors and adjusted for the removal of defendant's infringing sales." Kinder Report at ¶ 75.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████     Kindler admits, however, that "the

presentation is not clear as to whether the 'NA market Import data' figure, used to calculated market shares, is related to worldwide imports to North America of all tubes or only imports from Chinese manufacturers." *See* Ex. 1, Kinder Report at ¶22, n.29 ("I note that the presentation is not clear as to whether the "NA market Import data" figure, used to calculate the market shares, is related to worldwide imports to North America of all tubes or only imports from Chinese manufacturers."). In addition, Kindler admits that the "presentation does not specifically identify whether the market share included in this presentation are for LED tube lamps or all tube lamps."[3] *See* Ex. 1, Kinder Report at ¶ 88, n.234. Kindler further admits that there is "limited information available on market shares" and that she had to make numerous assumptions. *See id.* at ¶88, p.54.[4] These assumptions render Kindler's analysis unreliable. In addition, Kindler acknowledges that she uses the ███████████████████████████████████ to calculate Super Lighting's alleged Lost Profits.[5] *Id.* at ¶ 22 & n.30 and Exhibit 2 to Kindler's Report. ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ *See id.*

Moreover, Kindler's lost profits analysis necessarily fails based on her blind reliance on market share percentages in assuming causation of Super Lighting's claimed lost sales. In doing so, Kindler ignores specific evidence and testimony in this case indicating that Super Lighting was not capable of making at least a portion of the lost sales that Kindler includes in her calculation of lost profits.

---

[3] Ex. 1, Kindler Report, p. 54.
[4] *Id.* ("I understand that all of CH Lighting and Ruising's Accused Products and all of Super Lighting's sales of Patent-Practicing Products compete in the North American market for LED tube lamps. Given the limited information available on market shares, I assume that (1) the market share for exports to North America are similar to markets shares for exports specific to the United States and (2) the market shares included in the CH Lighting presentation are representative of market shares in the LED tube market").
[5] *Id.* p. 10.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

This is not the first time Kinder has failed to properly address causation as part of her analysis.  In *Verisign, Inc. vs. XYZ*.com, the Fourth Circuit upheld the district court exclusion of Kindler's testimony, noting:

> "citing *Daubert*, the district court concluded that Kindler's 'methods . . . are questionable' and that her 'conclusions are not reliable,' primarily because Kindler's analysis failed to distinguish between 'correlation' and 'causation.' [] We agree with the district court."
>
> . . .
>
> To be sure, Kindler does suggest that XYZ's profits during the time period in question were "at least in part due to the alleged false and misleading advertising,"

---

████████████████████████████████████████████
████████████████████████████████████████

[7] Ex. 4, Kindler Report, Exhibit 11.2.

and opines that "participants [in the domain-name market] view registration numbers as a measure of demand," so that "inflated registration figures [like XYZ's] are likely to entice market participants." [ ] But Kindler's analysis does not quantify any such effect, beyond establishing a temporal connection. And a conclusory repetition of Verisign's "gold rush" theory of the case does little, if anything, to advance the proximate-cause showing demanded by *Lexmark* and *PBM Products*.

*Verisign, Inc. v. XYZ.com LLC*, 848 F.3d 292, 300-01 (4th Cir. 2017).

Here Kindler's lost profit analysis has the same fatal flaw. She fails to show a causal link between any decrease in market share by Super Lighting to CH's alleged infringement. She fails to show a causal link between any lost sale due to CH's alleged infringement and Super Lighting's ability to make such sale(s) if CH Lighting had not infringed.

## ii.    Kindler Fails to Establish Super Lighting's Manufacturing Capacity and Capability.

Kindler states that she "evaluated Super Lighting's LED manufacturing equipment utilization data ███████████████" and concludes that Super Lighting had capacity across all of its manufacturing equipment and sufficient excess capacity to account for additional sales. *See* Ex. 1, Kindler Report at ¶80.  For this conclusion, Kindler relies on a single produced document, ██████████████████████████████ to support her conclusion that Super Lighting had enough manufacturing capacity to accommodate its portion of CH Lighting / Ruising's sales of the Accused Products. *Id.* ████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████ *Id.*  As a result, Kindler relies on a document that does not provide support for her entire conclusion as the document lacks sufficient

detail.  Notwithstanding this fact, Kindler asserts that to "the extent that there are variations in the assembly lines for the manufacture of different product types of the at-issue LED tube lamps, each of the automated lines had sufficient excess capacity to meet the manufacturing requirements associated with the lost sales to CH Lighting/Ruising." *See* Ex. 1, p. 49 ¶80.  Kindler cites no basis or support for this opinion.  Moreover, Kindler ignores deposition testimony ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

### iii. Kindler Fails to Establish Super Lighting's Marketing Capability to Generate Sales to New Customers

Kindler claims that Super Lighting would have been able to make sales to *all* of CH Lighting's customers, including customers for which Super Lighting had no existing sales or demonstrated ability to make sales over the alleged damages period ("non-overlapping customers").  Kindler does not offer *any* evidence that Super Lighting would have made additional sales to these "new" customers, and she ignores evidence that Super Lighting would not have been able to make these sales.  ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

iv.    **Kindler Assumes Price Erosion with No Supporting Analysis.**

In calculating Super Lighting's lost profits, Kindler assumes Super Lighting's lost sales would have occurred not at the actual sales price CH Lighting received, but at Super Lighting's prices. "Super Lighting's lost profits damages are determined by applying Super Lighting's annual incremental profit margins to the lost sales figures computed above." *See* Ex. 1, Kinder Report at ¶89.  In doing so, Kindler fails to account for price differences between the actual prices at which CH sold certain types of accused products and Super Lighting's actual prices.  For a number of accused product categories, CH Lighting's actual price is *lower* than Super Lighting's prices of products Kindler asserts would have been sold in lieu of CH Lighting's alleged infringement. ██

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ This equates to a price difference ████████ between CH Lighting's price and Super Lighting's price for the same category of product. ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██ This equates to a price difference ████████ between CH Lighting's price and Super Lighting's price for the same category of product.  Despite calculating average sales prices for both the accused and embodying products elsewhere in her report, Kindler fails to account for these price differences in her lost profit calculations.  Super Lighting bears the burden of establishing what amount of revenue and resulting profit Super Lighting would have made on any claim for lost sales.  Kindler performs no price sensitivity analysis or demand study and fails to provide any support for her assumption that CH Lighting's customers would have purchased Super Lighting's products in the "but for" world at prices higher than their actual purchasing behavior demonstrates.

**B.**     **KINDLER'S REASONABLE ROYALTY INDICATORS OF VALUE ARE UNRELIABLE.**

As part of her expert report, Kindler relies on license agreements that are significantly different than the hypothetical negotiation.

Evidence involving *Georgia-Pacific* factors, specifically *Georgia-Pacific* Factor 1 "must be tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and circumstances at the relevant time." *Uniloc USA Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011).  Courts have routinely rejected attempts by damages experts to rely on agreements that are not economically or technologically comparable to a hypothetical negotiation license and not properly adjusted for. *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870 (Fed. Cir. 2010) ("Yet Dr. David used licenses with no relationship to the claimed invention to drive the royalty rate up to unjustified double-digit levels. Dr. David based his damages on seven ResQNet licenses, five of which had no relation to the claimed invention."); *NetAirus Techs., LLC v. Apple, Inc.,* No. LACV1003257JAKEX, 2013 WL 11237200, at *8 (C.D. Cal. Oct. 23, 2013)("Thus, they involve many patents—sometimes hundreds of them—and involve parties that are positioned very differently with respect to each other than NetAirus and Apple."); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1329 (Fed. Cir. 2009) ("a lump-sum damages award cannot stand solely on evidence which amounts to little more than a recitation of royalty numbers, one of which is arguably in the ballpark of the jury's award, particularly when it is doubtful that the technology of those license agreements is in any way similar to the technology being litigated here.").

Kindler fails to properly account for differences between the facts and circumstances surrounding license agreements she relies on and facts and circumstances surrounding a

hypothetical negotiation between Super Lighting and Defendants. This renders Kindler's reasonable royalty opinions entirely unreliable.

█   ████████████████████████████

As one "indicator of value relating to the Patents-in-Suit," Kindler relies on a ████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
        █████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████   Super

Lighting values its entire portfolio, including hundreds of patents outside of the bounds of a hypothetical license. ████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████████████. As such, she fails to apportion to the value of the asserted Patents-in-Suit. Additionally, the ██████████████████████████ included a license grant to a

13

territory outside of the United States, specifically China ███████████████████████

███████████████████ Kindler fails to adjust for this difference as well.

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████

Kindler's use of a █████ per unit royalty rate from ████████████████████

fails a basic reasonableness check when applied to the Accused Products. ███████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

_____

███████████████████████████████████████

████████████████

██████████████

████████████████████████████████████████████. These

other indicators of value have lower rates than Kindler's effective rate and include broader rights.

█   ██████████████████████████████

     As another "indicator of value relating to the Patents-in-Suit," Kindler relies on a

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████. Kindler fails to properly account for the differences between the ████

████████████████████████ and a hypothetical negotiation between Super Lighting and CH

Lighting.

████████████████████████████████████████████████

████████████████████████████████ Kindler opines that this license

agreement ██████████████████████████████████████████

██████████████████████████ Kindler improperly converts a running rate based

on a percentage of revenue to a fixed price per unit rate.  Further, she artificially inflates an implied

per unit royalty through a baseless and incorrect attempt to convert the percentage of net sales

royalty in the ████████████████████████ to a fixed price per unit royalty. Kindler's

analysis is severely flawed and is unreliable.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[11] See Ex. 9, JSLE-CH-0195911 – 923.
[12] Ex. 1, Kindler Report, p. 68; ████████████████████████████████████████



As a result, Kindler's input is fundamentally flawed and results in an unreliable data point.  Using this ▇▇▇▇▇▇▇ price input, Kindler calculates an artificially high "effective" rate of $0.35 to $0.45 per unit that is not reliable or informative to a hypothetical negotiation between Super Lighting and CH Lighting and Elliott.  Ex. 1, Kindler Report at ¶ 104.  Moreover, Kindler offers no basis for even needing to convert the percentage of net sales royalty in the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ to a fixed price per unit royalty.

The flaw in Kindler's analysis is evident from a basic reasonableness check of the effective rates of a $0.35 to $0.45 per unit royalty applied to the Accused Products.  Kindler's own analysis

---

[14] Ex.1, Kindler Report, p. 46, Table 12.

calculates a weighted average sales price of $3.38 per unit for the CH Lighting / Ruising Accused Products over the alleged damages period.  *See* Ex. 1, Kindler Report, Exhibit 7.  A $0.35 per unit royalty represents an effective rate of 10.4%.[15]  A $0.45 per unit royalty represents an effective rate of 13.3%.[16]  Such rates, which would cover a license to only the asserted patents, are significantly higher than the effective rate ███ would pay Super Lighting for sales of accused products to Elliott, the stated royalty rate of ████████████████████████, and the ████████████████ rates discussed elsewhere in Kindler's report.  Each of these indicators of value have lower rates than Kindler's effective rates and include broader rights.

Further, Super Lighting's license grant to ████ included *all* of Super Lighting's intellectual property and granted ████ a worldwide license grant.[17]  Ex. 15, JSLE-CH-0195911 – 923 at JSLE-CH-0195911, JSLE-CH-0195913.   The hypothetical license between Super Lighting and Defendants must be adjusted to account for the fact that Defendants would not be receiving rights to Super Lighting's entire patent portfolio and would be restricted to products made, used, or offered for sale in the United States only.   Kindler fails to adjust for these differences.

## C.    THE COURT SHOULD EXCLUDE KINDLER'S OPINIONS THAT ARE BASED EXCLUSIVELY ON INTERVIEWS WITH SUPER LIGHTING'S PERSONNEL.

Experts must demonstrate thorough and independent vetting of facts and data. This threshold is not met even if party-provided data is from the owner or executives who manage the business. A Western District of Texas court excluded an expert where most of the information underlying his business damages analyses came to him from the party itself and was filled with untested assumptions without independent review.  *Stinson Air Ctr., LLC v. XL Speciality Ins. Co.*,

---

████████████████████████

[17] Ex. 9, JSLE-CH-0195911 – 923 at JSLE-CH-0195911.

No. CIV. SA-03-CA-61-FB, 2005 WL 5979096, at *3 (W.D. Tex. July 8, 2005) ("Because the opinions given are based solely upon representations of a party with an interest in the outcome of this lawsuit, without any independent review of ordinary sources of financial analysis, this Court finds [the expert's] methodology for formulating an expert opinion to be unorthodox and unreliable."). Similarly, a Northern District of Texas court excluded an expert on similar grounds based on the expert's reliance on the party's attorney. *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 798 (N.D. Tex. 2013) ("They have therefore failed to demonstrate that [the expert's] testimony is more than subjective belief or unsupported speculation.").

Courts have consistently excluded expert testimony where the expert functions as a mere "mouthpiece" for his or her client. *See, e.g.*, *MGM Well Servs., Inc. v. Mega Lift Sys., LLC*, No. CIV.A. H-05-1634, 2007 WL 150606, at *4 (S.D. Tex. Jan. 16, 2007) (excluding expert where testimony was "an effort to synthesize [party's] positions and present them summarily as an expert opinion"); *Marine Travelift, Inc. v. Marine Lift Sys., Inc.*, No. 10-C-1046, 2013 WL 3289076, at *6 (E.D. Wis. June 28, 2013) ("The question presented in MLS' motion is whether Dr. Breeden can offer as his own expert opinion the projections that the executives prepared. For the reasons already explained, the court concludes he may not.").

In her report in this case, Kindler routinely relies exclusively on interviews with Super Lighting's personnel, effectively acting as a mouthpiece for her client Super Lighting.

Many of Kindler's opinions in this case are not based on facts, documents, or data produced during the discovery process, but rather they are based on her conversations with certain Super Lighting representatives. In her expert report, Kindler cites conversations with ██████████████ ████████████████████████████████████████ *at least 15 times* as the exclusive purported basis for statements made in the report. *See* Ex. 1—Kindler Report, p. 11 ¶23, p. 26

¶43(c), p. 28 n.148, p. 40 n.195, p.46 n.212, p. 52 n.229, p. 53 n.230, p.54 ¶88(b)(i)(1), p. 66 nn.268 & 272, p. 68 ¶104(b) & nn. 278 & 280, p. 69 ¶106, p. 85 ¶142, and p. 94 n.342.

A few examples illustrate the problem with Kindler's approach:

████████████████████████████████████████████████████████

████████████████████████████████████

These are just a few examples of the numerous instances where Kindler relies exclusively on her interviews with Super Lighting's representatives as the sole support for statements and opinions she offers in her report. The information conveyed to Kindler solely in these conversations with Super Lighting's representatives is unsupported by any facts, documents, or data produced by Super Lighting during discovery. Kindler fails to offer independently derived opinions and she has not independently identified *any* underlying data or information supporting the information conveyed to her solely in conversations with Super Lighting's representatives. Based on the authorities cited and discussed above, Kindler's opinions do not qualify as admissible expert testimony under *Daubert*. Courts have routinely excluded expert testimony as unreliable where, as here, the expert failed to independently verify the reliability and accuracy of assumptions and data supplied by a party or its counsel to calculate damages. *See e.g.*, *Robroy Indus.*, 2017 WL 1319553, at *3; *Marine Travelift, Inc.*, 2013 WL 3289076, at *4-5; *Stinson Air Ctr*, 2005 WL 5979096, at *3; *Orthoflex*, 986 F. Supp. 2d at 798; *MGM Well Servs.*, 2007 WL 150606, at *4. Kindler's opinions that rely exclusively on interviews with Super Lighting representatives are nothing more than a parroting of Kindler's conversations with Super Lighting's representatives. In these instances, Kindler applies no specialized knowledge or skill that will assist the jury. Instead, Kindler functions merely as a mouthpiece for Super Lighting's representatives and all such testimony should therefore be excluded.

## V.    CONCLUSION

Defendants respectfully requests that the Court (1) grant this motion, (2) exclude Kindler's impermissible opinions, (3) preclude Kindler from offering those opinions at trial, and (4) grant Defendants any such other relief the Court deems necessary and proper.

Dated: August 9, 2021                                    Respectfully Submitted,

/s/ Robert S. Hill
Robert S. Hill (Lead counsel)
Texas Bar No. 24050764
Email: robert.hill@hklaw.com
Sara Schretenthaler Staha
Texas Bar No. 24088368
HOLLAND & KNIGHT LLP
200 Crescent Court, Suite 1600
Dallas, TX 75201
Telephone: (214) 964-9500
Facsimile: (214) 964-9501

Allison M. Lucier (*Pro Hac Vice*)
Massachusetts Bar No. 569193
Email: allison.lucier@hklaw.com
10 Saint James Avenue, 11th Floor
Boston, MA 02116
Telephone: (617) 523-2700
Facsimile: (617) 523-6850

Stacey H. Wang *(Pro Hac Vice)*
California Bar No. 245195
Email: stacey.wang@hklaw.com
400 South Hope Street
Los Angeles, CA 90071
Telephone: (213) 896-2400

Leonie Huang (*Pro Hac Vice*)
New York Bar No. 5128442
Email: leonie.huang@hklaw.com
31 West 52nd Street
New York, New York 10019
Telephone: (212) 513-3398
Facsimile: (212) 385-9010

***Counsel for Defendants***

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has

been served on August 13, 2021 to counsel of record via the Court's CM/ECF system.


_/s/ Robert S. Hill_
Robert S. Hill