# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# WACO DIVISION

| | |
|---|---|
| **JIAXING SUPER LIGHTING ELECTRIC APPLIANCE CO., LTD. AND OBERT, INC.,** § § § § | |
| Plaintiffs, § | **Case No. 6:20-cv-00018-ADA** |
| § | |
| v. § | **JURY TRIAL DEMANDED** |
| **CH LIGHTING TECHNOLOGY CO., LTD., ELLIOTT ELECTRIC SUPPLY INC. AND SHAOXING RUISING LIGHTING CO., LTD.,** § § § § § § | **PUBLIC VERSION** |
| Defendants. § | |

**DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE
CERTAIN OPINIONS AND TESTIMONY OF LAUREN KINDLER**

**CONTAINS MATERIAL DESIGNATED AS
HIGHLY CONFIDENTIAL: ATTORNEYS' EYES ONLY**

FILED UNDER SEAL — PURSUANT TO PROTECTIVE ORDER

Defendants CH Lighting Technology Co., Ltd, and Shaoxing Ruising Lighting Co., Ltd, (collectively, "CH Lighting"), Elliott Electric Supply Inc. ("Elliott") (CH Lighting and Elliott, collectively are "Defendants"), pursuant to Rule 702 of the Federal Rules of Evidence, file this reply in support of their motion to exclude certain opinions and testimony of Lauren Kindler ("Kindler"), who Plaintiffs Jiaxing Super Lighting Electric Appliance Co., Ltd., and Obert, Inc. ("Super Lighting") disclosed as a damages expert, and to preclude Kindler from offering certain opinions at trial.

## I. INTRODUCTION

Super Lighting's attempts to resuscitate Kindler's opinions ring hollow. Super Lighting fails to refute that Kindler's market share opinion is based on the wrong geography, artificially filters relevant market participants, and conflates Super Lighting with a non-party entity. Additionally, Kindler wholly and improperly ignores real world limitations on Super Lighting's capacity to make additional sales and real world purchasing habits of customers.

Kindler's royalty damages are similarly on shaky grounds. Although Super Lighting claims that the flaws in her application of existing licensing agreements go to the weight and not the admissibility of the evidence, these flaws make Kindler's methodology unreliable and cause her opinions to have a high likelihood of misleading the factfinder. Both licensing agreements used by Kindler cover Super Lighting's entire patent portfolio ██████████████, instead of only the three remaining patents in this case. Moreover, these agreements have a broader geographic scope than would be at issue in the hypothetical negotiation. Super Lighting admits that Kindler did not control for these factors.

In light of these considerations, as further explained below, Kindler's report and opinions should be excluded.

1

FILED UNDER SEAL — PURSUANT TO PROTECTIVE ORDER

## II. ARGUMENTS

**A. KINDLER'S MARKET SHARE ANALYSIS IS UNRELIABLE BASED ON ITS FLAWED UNDERLYING DATA.**

### i. Kindler Admits that the Market Share Data Used Is Not Limited to the Correct Martket or the Correct Party.

First, Super Lighting attempts to allege that Defendants have blessed or approved the Market Share statistics used by Super Lighting because the Market Share numbers that Kindler used come from a CH Presentation, Dkt. # 148, Resp. at 5. This does not follow. That the underlying data comes from a CH Lighting internal document does not make it appropriate for use in litigation, as the metrics in the original document are not the same as those at issue in this case. *State Indus., Inc. v. Mor-Flo Indus.*, 883 F.2d 1573, 1579 (Fed. Cir. 1989) (applying a national market); *Beijing Choice Elec. Tech. Co. v. Contec Med. Sys. USA Inc.*, No. 18 C 0825, 2020 WL 1701861, at *9 (N.D. Ill. Apr. 8, 2020)(discussing that the appropriate market share is limited to the United States). Her report relies on market share data that is not specific to the market relevant to this litigation, namely, the United States. *See* Ex. 10, Deposition of Lauren Kindler 132:24-133:3; *See* Ex. 1 to Motion [Dkt. #142-2], ███████

███████ *See* Ex. 1 to Motion [Dkt. #142-2], Kinder Report at ¶ 88, n.234. Indeed, she admits that the market share data she uses for her analysis applies to North America as a whole, and not to the United States. She also acknowledges that the market she uses contains only Chinese exporters—not the only participants in the relevant market. ███████

███████ . *Id.* at ¶ 22 & n.30 and Exhibit 2 to Kindler's Report. In addition, Kindler admits that the ███████

2

████████████████████████████████████

████████████ *Id.* at p. 54. Therefore, the market used in the presentation relied on by Kindler may not even be looking at the relevant kinds of products. In other words, Kindler's opinion is based on the wrong geography, artificially filters relevant market participants, and conflates Super Lighting with a non-party entity.

Super Lighting attempts to hide behind a claim that the figures used are "conservative." *See* Dkt. #149 at 6, Super Lighting cannot hide behind Kindler's claimed "conservatism" when the figures used do not relate the proper inquiry for the fact finder. Although Super Lighting claims that Kindler's analysis of an improperly-defined market goes to the weight and not the admissibility of the testimony, this is incorrect. Kindler is analyzing one market to prove damages with respect to a different market, and this goes directly to the heart of the reliability of her methods. *Driving Force Techs., Inc. v. Panda Distribution, Inc.,* No. 4:10-CV-24, 2012 WL 1805151, at *2 (E.D. Tex. Feb. 21, 2012) (holding that a lost profit analysis was "too speculative" when the economist applied market share data that did not fit the relevant inquiry).

ii. **Kindler Ignores Real World Evidence of Super Lighting's Capacity to Make Additional Sales and Customer Purchasing Habits.**

Super Lighting claims that Kindler can ignore real world evidence of customer purchase decisions if using a market share approach. *See* Dkt. # 149, Resp. at 7-8. Even if Kindler's market share approach was reasonable—and it is not—she still must establish to a reasonable degree of certainty that Super Lighting would have made sales of the accused products "but for" Defendants' alleged infringement. *See, e.g., BIC Leisure Prod., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1219 (Fed. Cir. 1993). Kindler has failed to do so.

Kindler's use of the market share approach to calculate Super Lighting's lost profits is one method for *implementing* a lost profits calculation but the market share approach does not, as

FILED UNDER SEAL — PURSUANT TO PROTECTIVE ORDER

Kindler assumes, automatically result in establishing lost profits to a reasonable certainty. Kindler cannot ignore real world factual evidence that Super Lighting was not in a position to make at least a portion of the lost sales that Kindler includes in her calculation of lost profits. In short, Kindler's analysis fails the first step in any lost-profits analysis, establishing that the patent holder had the capability to make additional sales of the accused products in the "but for" world.

Super Lighting argues that "Kindler did not opine on which customers would be purchasing the lost sales from Super Lighting" and "Kindler similarly did not opine that each individual CH Lighting or Ruising customer would purchase a portion of the accused products from Super Lighting." *See* Dkt.. #149, Resp. at 7. While Kindler does not present a lost profits number by customer, the mechanics of Kindler's lost profits calculation are that she assumes a portion of all accused revenue earned by Defendants would have gone to Super Lighting in the "but for" world. *See* Ex. 11, Deposition transcript of D. Mooney, at 160:15-162:19. As part of that analysis, Kindler inherently assumes a portion of sales to each customer would have gone to Super Lighting in the "but for" world. Super Lighting argues that while a "particular customer may purchase more or less than ▇ from Super Lighting, but the overall result is Super Lighting takes up ▇ of the entire market." *See* Dkt. #149, Resp. at 7. This is inherently flawed and unreliable. Kindler cannot ignore factual evidence that Super Lighting was not capable of making sales to certain customers of Defendants. Nor can she merely assume that Super Lighting would have increased sales to *other* customers, above and beyond the amount of Super Lighting's relative market share. Kindler cannot assume, with no causal support, that Super Lighting would have obtained its actual market share even if it was not capable of making sales to certain market customers that make up Defendants' market share.

Kindler's Lost Profits calculation assumes that Super Lighting would have made a total of ████████ unit sales of the Type A T5 products, including ████████ ████████ ████████████████████████████████ *See* Ex. 1 to Motion [Dkt. #142-2], Kindler Report at Exhibit 5. Kindler's report provides no explanation regarding expenses that would be incurred by Super Lighting to add this product to its manufacturing line or product offerings.

### iii. Kindler Assumes Price Erosion with No Supporting Analysis.

Super Lighting argues that "Super Lighting's products are not consistently priced higher than Defendants'" and that "some product types are priced slightly higher and some are priced slightly lower, and both companies have been able to make sales to customers." *See* Dkt. # 149, Resp. at 10. Super Lighting once again argues that "the market share approach she [Kindler] employed appropriately accounts for these slight differences in pricing and potential price sensitivity among customers. *See* Dkt. # 149, Response at 10. This factually misstates Kindler's analysis. Kindler assumes Super Lighting's lost sales would have occurred not at the actual sales price CH Lighting received, but at Super Lighting's prices. Kindler fails to account for price differences between the actual prices at which CH Lighting sold certain types of accused products and Super Lighting's actual prices. For a number of accused product categories, CH Lighting's actual price is lower than Super Lighting's prices of products that would have been sold in lieu of CH Lighting's alleged infringement. *See* Ex. 1 to Motion [Dkt. #142-2], Kindler Report at Table 12. The price difference between Super Lighting's products and CH Lighting's products are not always "slight" as Super Lighting suggests. For example, for the Type B T5 product, CH Lighting's average sales price over the alleged damages period is ████████. *See* Ex. 1 to

---

[1] Ex. 1 to Motion [Dkt. #142-2], Kindler Report, Exhibit 11.2.

Motion [Dkt. #142-2], Kindler Report at Table 12. Super Lighting's average sales price for the same category of product is ▇. *Id.* This equates to a price difference of ▇ between CH Lighting's price and Super Lighting's price for the same category of product. *Id.* For the Type A + B T8 product, CH Lighting's average sales price over the alleged damages period is ▇ per unit. *Id.* Super Lighting's average sales price for the same category of product is ▇. *Id.* This equates to a price difference of ▇ between CH Lighting's price and Super Lighting's price for the same category of product. Super Lighting bears the burden of establishing what amount of revenue and resulting profit Super Lighting would have made on any claim for lost sales. *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1359 (Fed. Cir. 2001) (finding that price erosion included in a market share approach requires but-for causation). Super Lighting offers no argument that Kindler performed a price sensitivity analysis or demand study, because she did not. *See* Ex. 10, Kindler Dep. 129:9-14. Kindler merely assumes that CH Lighting's customers would have purchased Super Lighting's products in the "but for" world at prices higher than their actual purchasing behavior demonstrates. Once again, Kindler cannot blindly rely on use of a market share approach as accounting for this difference. The mechanics of Kindler's lost profits opinion are that she calculates lost profits at Super Lighting's prices and fails to account for the role of price in creating demand for the accused products.

**B.     KINDLER DOES NOT PROPERLY ACCOUNT FOR ECONOMIC FACTORS IN DETERMINING REASONABLE ROYALTY RATE.**

Kindler's support for her reasonably royalty rate have been manipulated beyond recognition when compared to the original underlying license agreements. Super Lighting attempts to explain this away by noting that "comparable licenses are almost never perfectly analogous to the infringement action." *VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1330 (Fed Cir. 2014); Dkt. #149, Resp. at 10. But, as Super Lighting admits "when using another license for comparative

purposes under Georgia-Pacific, a damages expert must account for differences in the economic circumstances." Dkt. #149, Resp. at 10, citing *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211-12 (Fed. Cir. 2010). This is exactly where Kindler's analysis fails. Defendants are not arguing that the agreements relied on by Kindler are not technologically comparable. The issue is that the agreements relied on by Kindler are not economically comparable to the facts and circumstances surrounding a hypothetical negotiation between Super Lighting and Defendants in this matter and Kindler wholly fails to account for these economic differences. This renders Kindler's reasonable royalty opinions entirely unreliable. *Uniloc USA Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (finding that the calculation "must be tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and circumstances at the relevant time.").

    i.    █████████████ **Agreement**

Super Lighting argues that, despite the fact that ████ licensed Super Lighting's entire patent portfolio, the stated royalty rate in the agreement represents a reasonable royalty for only a subset of those patents, the asserted patents in this case because of the purported competitive relationship between Super Lighting and CH Lighting. *See* Dkt. #149, Resp. 11-14.

According to Kindler, "" *See* Ex. 1 to Motion [Dkt. #142-2], Kindler Report, at ¶ 103. Super Lighting values its entire portfolio, including ████████ patents outside of the bounds of a hypothetical license. *Id.* Kindler's cursory explanation that the stated ████ per unit royalty from the ████████

███ Agreement does not be adjusted to account for the fact that CH Lighting would only be negotiating for rights to the asserted three Patents-in-Suit because of a competitive relationship between the parties does not cure her shortcoming. Kindler's failure to quantify any adjustment when moving from a license to an entire portfolio to a subset of only the asserted Patents-in-Suit fails to apportion to the value of the asserted Patents-in-Suit. Kindler essentially argues that her analysis is a black box, that she considered both the value of the entire patent portfolio and the competitive relationship between the parties, concluding that the stated rate to a portfolio of hundreds of patents would apply to a license to only the asserted Patents-in-Suit. The standard for a damages expert opinion is higher and more is required to support such an opinion.

    ii.    ██████████ Agreement

Super Lighting claims that "Defendants not argue the ███ Agreement is not comparable. Rather, all of Defendants' arguments boil down to whether Ms. Kindler's per-unit royalty rate is accurate, which is a question for the fact finder." *See* Dkt. #149, Resp. at 14. This both misstates Defendants' argument and misstates the law. *See, e.g., NetAirus Techs., LLC v. Apple, Inc.,* No. LACV1003257JAKEX, 2013 WL 11237200, at *8 (C.D. Cal. Oct. 23, 2013)("Thus, they involve many patents—sometimes hundreds of them—and involve parties that are positioned very differently with respect to each other than NetAirus and Apple."); *Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1329 (Fed. Cir. 2009) ("a lump-sum damages award cannot stand solely on evidence which amounts to little more than a recitation of royalty numbers, one of which is arguably in the ballpark of the jury's award, particularly when it is doubtful that the technology of those license agreements is in any way similar to the technology being litigated here."). Defendants are not arguing that the ███ agreement is not *technologically* comparable. This issue is that the ███ agreement, as converted to a per-unit rate by Kindler, is not *economically* comparable to

the facts and circumstances surrounding a hypothetical negotiation between Super Lighting and Defendants in this matter. Kindler fails to account for these economic differences.

Kindler improperly converts a running rate based on a percentage of revenue to a fixed price per unit rate. Further, she artificially inflates an implied per unit royalty through a baseless and incorrect attempt to convert the percentage of net sales royalty in the ▮▮▮▮ Agreement to a fixed price per unit royalty. Kindler's analysis is severely flawed and is unreliable.

Kindler admitted in her deposition that she used a retail price of ▮▮▮ per unit for a ▮▮▮ product to convert the stated rate in the ▮▮▮ agreement to a per-unit rate. *See* Ex. 10, Kindler Dep. at 184:10-185:25. However, the ▮▮▮▮ agreement states that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Ex. 9 to Motion [Dkt. #142-10], JSLE-CH-0195911 – 923 at JSLE-CH-0195913.

Kindler cites no evidence, in the form of royalty reports or any other documentary evidence, indicating that ▮▮▮ ever paid Super Lighting ▮▮▮▮▮▮▮▮▮▮▮▮. *See generally* Ex. 2. In fact, Kindler acknowledges that ▮▮▮ never paid Super Lighting any amount under the royalty rate. *See* Exh. 10, Kindler Dep. 200:10-14. Super Lighting argues that whether the prices used by Kindler to convert to a per-unit rate are retail or wholesale does not matter, that Kindler's opinions regarding a ▮▮▮▮▮▮▮▮▮▮ are unchanged regardless of the level of commerce considered. *See* Dkt. #149, Resp. at 14. This is entirely unreliable. Kindler attempts to cure this fatal flaw in her analysis by claiming in her deposition that the relevant wholesale price at the time of the ▮▮▮ agreement in ▮▮▮ would have been approximately the same as the ▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Dkt. #149, Resp. at 14. Kindler failed to offer this opinion in her expert report. Kindler offered no evidence

of ▅ wholesale prices in ▅. Kindler cannot be allowed to testify to a royalty rate that she improperly converts from a stated percentage of revenue to a per-unit amount using flawed, unreliable data points.

Finally, Super Lighting's license grant to ▅ is subject to the same issue as the ▅ license—that it included *all* of Super Lighting's intellectual property. *See* Ex. 9 to Motion [Dkt. #142-10]. The hypothetical license between Super Lighting and Defendants must be adjusted to account for the fact that Defendants would not be receiving rights to Super Lighting's entire patent portfolio and would be restricted to products made, used, or offered for sale in the United States only. Kindler fails to adjust for these differences.

**C.   THE COURT SHOULD EXCLUDE KINDLER'S OPINIONS THAT ARE BASED EXCLUSIVELY ON INTERVIEWS WITH SUPER LIGHTING'S PERSONNEL.**

Super Lighting's claims that Kindler's reliance on her interviews with ▅ are proper rings hollow. Super Lighting attempts to justify Kindler's reliance based on the fact that Super Lighting deposed ▅, therefore any later developed claims through an expert report are admissible. This is simply not permitted. *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013) (upholding exclusion of certain expert testimony that an afoul of Rule 703 because the expert merely repeated information gathered from the party). Kindler should not be allowed to turn ▅ words into her expert opinion merely by repeating what he told her.

### III.   CONCLUSION

Defendants respectfully requests that the Court (1) grant Defendants' motion, (2) exclude Kindler's impermissible opinions, (3) preclude Kindler from offering those opinions at trial, and (4) grant Defendants any such other relief the Court deems necessary and proper.

FILED UNDER SEAL — PURSUANT TO PROTECTIVE ORDER

Dated: August 30, 2021                                          Respectfully Submitted,

/*s/ Robert S. Hill*
Robert S. Hill (Lead counsel)
Texas Bar No. 24050764
Email: robert.hill@hklaw.com
Sara Schretenthaler Staha
Texas Bar No. 24088368
HOLLAND & KNIGHT LLP
200 Crescent Court, Suite 1600
Dallas, TX 75201
Telephone: (214) 964-9500
Facsimile: (214) 964-9501

Allison M. Lucier (*Pro Hac Vice*)
Massachusetts Bar No. 569193
Email: allison.lucier@hklaw.com
10 Saint James Avenue, 11th Floor
Boston, MA 02116
Telephone: (617) 523-2700
Facsimile: (617) 523-6850

Stacey H. Wang *(Pro Hac Vice)*
California Bar No. 245195
Email: stacey.wang@hklaw.com
400 South Hope Street
Los Angeles, CA 90071
Telephone: (213) 896-2400

Leonie Huang (*Pro Hac Vice*)
New York Bar No. 5128442
Email: leonie.huang@hklaw.com
31 West 52nd Street
New York, New York 10019
Telephone: (212) 513-3398
Facsimile: (212) 385-9010

***Counsel for Defendants***

FILED UNDER SEAL — PURSUANT TO PROTECTIVE ORDER

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been served on to counsel of record via the Court's CM/ECF system.

          */s/ Robert S. Hill*
          Robert S. Hill