IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| JIAXING SUPER LIGHTING ELECTRIC APPLIANCE CO., LTD. and OBERT, INC.,<br>Plaintiffs,<br><br>*v.*<br><br>CH LIGHTING TECHNOLOGY CO., LTD., ELLIOTT ELECTRIC SUPPLY INC., and SHAOXING RUISING LIGHTING CO., LTD.,<br>Defendants. | 6:20-cv-00018-ADA |

## MEMORANDUM OPINION & ORDER

Came on for consideration this date are Plaintiffs' Motion for Enhancement of Damages Under 35 U.S.C. § 284, ECF No. 233; Plaintiffs' Motion for Permanent Injunction, ECF No. 234; Plaintiffs' Opposed Motion for Exceptional Case and Attorney Fees, ECF No. 241; and Plaintiffs' Motion for Entry of Judgment, ECF No. 242.

## I. BACKGROUND

On January 10, 2020, Plaintiffs Jiaxing Super Lighting Electric Appliance Co., Ltd. ("Super Lighting") and Obert, Inc. ("Obert") (collectively, "Plaintiffs") initiated this Action by filing a complaint alleging that Defendants CH Lighting Technology Co., Ltd. ("CH Lighting" or "CH"), Elliott Electric Supply Inc. ("Elliott"), and Shaoxing Ruising Lighting Co. Ltd. ("Ruising") (collectively, "Defendants") infringe certain U.S. patents. ECF No. 1 (the "Complaint"). On March 16, 2020, Plaintiffs filed an amended complaint alleging infringement of U.S. Patent Nos. 10,295,125 (the "'125 patent"), 10,342,078, 10,352,540 (the "'540 patent"), and 10,426,003, 9,939,140 (the "'140 patent"), 10,378,700, 10,448,479, and 10,560,989. ECF No. 21 (the "FAC"). CH answered on December 3, 2020. ECF No. 67. The Plaintiffs' patents

and Defendants' accused products are directed to light-emitting diode (LED) tube lamps and features thereof.

Super Lighting is a Chinese corporation and Obert is its North American affiliate. ECF No. 21 ¶¶ 1, 2. CH and Ruising are also Chinese corporations and Elliott is a customer of some sort based out of Texas. *See, e.g.*, ECF No. 237 at 40:12–20, 46:18–22, 78:9–79:10. Ruising is the subsidiary of CH charged with selling CH products.[1] *See id.* at 78:9–79:10. Super Lighting and CH are rivals in the tube lamp space. Ruising is owned at least by Caiying Gan, CEO of CH, and Qingbo "Jack" Jiang, who also runs Ruising. *See id.* at 78:9–79:10. Before he was at Ruising, Jack Jiang was a Super Lighting employee. He left in 2014 to join Ruising and later convinced Jun Yang, technical assistant and secretary to Super Lighting's CEO and founder, to join him there. *See id.* at 82:15–83:7. According to Super Lighting's CEO, Mr. Yang had access to Super Lighting's most confidential, technical documents. *Id.* at 82:24–83:5. Mr. Yang is now a product manager at Ruising. *See id.* at 204:1–9.

On October 6, 2021, the Court held a pre-trial conference in this Action. *See* ECF Nos. 190, 191. Trial commenced on November 1, 2021. *See* ECF No. 216. At trial, Plaintiffs had narrowed their case such that they only asserted infringement of claim 1 of the '125 patent, claims 1, 4, 5, 24, 28, and 31 of the '140 patent, and claims 13 and 14 of the '540 patent. Shortly before trial, Defendants stipulated that:

> all existing versions of all products accused of infringing the '540 Patent infringe claims 13 and 14 of the '540 Patent, including the following products: CH1118 series, CH1128 series, CH1152 series, CH11152S series, CH1152-42W-FA8 series, CH1152AS series, CH1152SD series, CH1155C series, CH1156 series, CH1157 series, CH1157S series, CH1157AS series, CH1157SD series, CH1180 series, CH1198 series, CH1198D series, LV1118,

---

[1] When the Court refers to CH it is oftentimes referring to CH and Ruising collectively.

LV1153DA, LV1155, LV1155NA, LV1156, ESL Vision GDT series, ESL Vision PBC series, GE Current BDT series (*e.g.,* LED14BDT8/G4/840). The infringing products include products within the foregoing series manufactured by CH Lighting and Ruising for sale under different brand names; for example, the "CH1152S series" includes the Keystone-branded KT-LED7T8-24GC-840-DX2, others in that series, the Maxlite-branded L11.5T8DE440-CG4, and others in that series.

*Id.* at 8. Defendants further stipulated:

that all existing versions of all products accused of infringing the '125 Patent infringe claim 1 of the '125 Patent, including the following product series: CH1118 series, CH1128 series, CH11152S series, CH1152-42W-FA8 series, CH1152AS series, CH1152SD series, CH1155C series, CH1156 series, CH1157S series, CH1157AS series, CH1157SD series, CH1180 series, CH1180AX series, CH1198 series, CH1198D series, LV1118, LV1153DA, LV1155, LV1155NA, LV1156, ESL Vision GDT series, ESL Vision PBC series, GE Current BDT series (e.g. LED14BDT8/G4/840). The infringing products include products within the foregoing series manufactured by CH Lighting and Ruising for sale under different brand names; for example, the "CH1152S series" includes the Keystone-branded KT-LED7T8-24GC-840-DX2, others in that series, the Maxlite-branded L11.5T8DE440-CG4, and others in that series.

*Id.* at 8–9. Moreover, Defendants stipulated:

that the following products accused of infringing the '140 patent infringe claims 1, 4, 5, 24, 28, and 31 of the '140 Patent: CH11152S series, CH1152-42W-FA8 series, CH1152AS series, CH1157S series, CH1157AS series, CH1152SD series, CH1157SD series, CH1198D, ESL Vision GDT series, ESL Vision PBC series, GE Current BDT series (*e.g.,* LED14BDT8/G4/840). This excludes such products sold with the LT2600 integrated circuit, which remain disputed. The infringing products include products within the foregoing series manufactured by CH Lighting and Ruising for sale under different brand names; for example, the "CH1152S series" includes the Keystone-branded KT-LED7T8-24GC-840-DX2, others in that series, the Maxlite-branded L11.5T8DE440-CG4, and others in that series.

*Id.* at 9. Altogether, Defendants stipulated to infringement for all but one accused product—

Defendants argued to the Jury that the LT2600 integrated circuit did not infringe the asserted

claims of the '140 patent. Defendants also presented an invalidity case against the '125, '140, and '540 patents (the "Asserted Patents") to the Jury.

On the third day of trial, the Court granted a pre-verdict motion for judgment as a matter of law (JMOL) under Federal Rule of Civil Procedure 50(a) on the issue of the invalidity relating to the '125 patent and the '540 patents. ECF No. 239 at 47:8–53:11. The Court held that there was not a legally sufficient evidentiary basis upon which a reasonable jury could have concluded that: claim 1 of the '125 patent was invalid based on any of Defendants' three prior-art grounds against that patent; or the asserted claims of the '540 patent were invalid based on one of Defendants' two prior-art grounds against that patent. *Id.* Defendants based these deficient prior-art grounds on system prior art—physical lighting tubes—that Defendants failed to introduce into evidence before evidence closed. *See id.*

On November 4, 2021, the Jury rendered a unanimous verdict, finding that Defendants infringed all Asserted Claims and that Defendants failed to prove that any Asserted Claim was invalid. ECF No. 230. The Jury awarded damages in the amount of $13,872,872 from CH and Ruising and $298,454 from Elliott and further found that CH and Ruising willfully infringed. *Id.*

On November 24, 2021, Plaintiffs moved for enhanced damages and a permanent injunction. ECF Nos. 233, 234. On December 2, 2021, Plaintiffs moved for attorneys' fees and entry of judgment. ECF Nos. 241, 242. The Court heard oral arguments on those motions on February 15, 2022. *See* ECF No. 279. Those motions are now ripe for judgment.

## II. ENHANCED DAMAGES

Plaintiffs' Motion for Enhanced Damages, ECF No. 233, is **GRANTED-IN-PART**.

### A.    Legal Standard

Section 284 of Title 35 provides that, in a patent infringement case, "the court may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. As the

Supreme Court has remarked in the seminal *Halo* decision, "That language contains no explicit limit or condition, and we have emphasized that the word 'may' clearly connotes discretion." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103 (2016) (cleaned up). That discretion is not boundless and instead must be exercised "in light of considerations underlying the grant of that discretion." *Id.* (cleaned up). In interpreting those considerations, the Supreme Court appealed to the judiciary's 180-year history of awarding enhanced damages, in which courts have "generally reserved" enhancement for "egregious cases of culpable behavior." *Id.* at 104. Egregious cases typically involve, in the Court's opinion, conduct that is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Id.* at 103–04; *id.* at 107 ("[S]uch punishment should generally be reserved for egregious cases typified by willful misconduct.").

"Willfulness largely turns on intent, which is an issue reserved to the jury." *See WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016). Once the jury finds that the defendant's infringement was willful, the Court must consider whether that alone justifies enhancement. According to the Federal Circuit, "*Halo* emphasized that subjective willfulness alone . . . can support an award of enhanced damages." *WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358, 1362 (Fed. Cir. 2016), *rev'd on other grounds*, 138 S. Ct. 2129, 201 L. Ed. 2d 584 (2018); *Halo*, 579 U.S. at 105 ("The subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced damages, without regard to whether his infringement was objectively reckless."). Yet courts are vested with discretion to forbear enhancement under § 284 even in egregious cases, if that is what "the particular circumstances of" the case demand. *Id.* at 106; *cf. id.* at 111 (Breyer, J., dissenting) ("[W]hile the Court explains that 'intentional or knowing' infringement 'may' warrant a punitive sanction, the word it uses is

5

*may*, not *must*. . . . It is 'circumstanc[e]' that transforms simple knowledge into such egregious behavior, and that makes all the difference.").

The Federal Circuit has endorsed consideration of the *Read* factors to "assist the trial court in evaluating the degree of the infringer's culpability and in determining whether to exercise its discretion to award enhanced damages at all, and if so, by how much the damages should be increased." *WCM Indus., Inc. v. IPS Corp.*, 721 F. App'x 959, 972 (Fed. Cir. 2018). As to burdens, the "party seeking enhanced damages under § 284 bears the burden of proof by a preponderance of the evidence." *WBIP*, 829 F.3d at 1339.

## B.    Discussion

In *Read Corp. v. Portec, Inc.*, the Federal Circuit established a list of factors for district courts to evaluate when considering whether an infringer's behavior warrants enhanced damages. 970 F.2d 816 (Fed. Cir. 1992). Although *Halo* likely overruled *Read*, the *Read* factors still serve as "useful guideposts" in the § 284 analysis. *See, e.g., Apple Inc. v. Samsung Elecs. Co.*, 258 F. Supp. 3d 1013, 1030 (N.D. Cal. 2017). As such, the Court uses *Read* as a tool in reviewing Defendants' conduct. The *Read* factors are: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when it knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) defendant's size and financial condition; (5) closeness of the case; (6) duration of defendant's misconduct; (7) remedial action by the defendant; (8) defendant's motivation to harm; and (9) whether defendant attempted to conceal its misconduct. 970 F.2d at 827. The Court proceeds through each factor one by one.

1.       *Read* Factor 1: Deliberate Copying

The first *Read* factor concerns whether Defendants deliberately copied Super Lighting's designs. The Court is not persuaded that Plaintiffs have shown any copying. While they detail Jack Jiang and Jun Yang's sojourn from Super Lighting to CH, Plaintiffs do not outright accuse those two of designing and developing the accused products to match Super Lighting's products. ECF No. 233 at 1–2, 17. That is, of course, the suggestion. But Plaintiffs do not offer evidence of how the accused products were designed and developed or who was involved. Defendants fill in the gaps, remarking that the bulk of Plaintiffs' infringement allegations for the '140 patent "relate to the use of an integrated circuit developed by third-party manufacturers . . . and purchased by CH." ECF No. 247 at 2. CH's corporate witness testified that CH has little understanding of the internal structure of those third-party-manufactured integrated circuits or how they work. *See* ECF No. 247-3 at 25:14–16. This evidence weighs against a finding of copying (at least for purposes of enhancement).

Plaintiffs' heavy reliance on documents found in CH's possession is not persuasive evidence of copying. It is undisputed that CH possesses confidential testing reports on Super Lighting tubes and a comparison of Super Lighting and CH tubes. As to the former, Plaintiffs do not tie the confidential Super Lighting testing reports to the design and development of the accused products. *See* ECF No. 247 at 3–4. As to the latter, in 2017 CH personnel drafted a one-page analysis comparing CH's accused tubes to Super Lighting's accused tubes, at Jack Jiang's request and with an eye, it seems, to features that the '140 patent happens to claim. ECF No. 233 at 17; ECF No. 225-6; ECF No. 237 at 140:18–142:5. Yet, as Defendants note, the analysis identifies several differences between the accused product and Super Lighting's product. ECF No. 247 at 2. The Jury heard from the engineer who produced the comparison: "Both [CH and Super Lighting] can satisfy the UL standard, but their suppliers are different, their schematics are

different, their chip solutions are also different." ECF No. 237 at 142:6–10. And he denied ever copying or being asked to. *Id.* at 141:12–17. This cuts against a finding of copying.

The Court also agrees with Defendants that CH's comparison of the *finished* accused product to Super Lighting's product has little bearing on copying. It would be a different story if CH had used a similar comparison to guide the design and development of its accused products. But benchmarking your finished accused product against your competitor's product is not, in this Court's estimation, strong evidence of copying. Especially in an industry where, as Super Lighting's own expert conceded, it is common practice to review competitor products. ECF No. 239 at 116:22–24.

Considering all this evidence, the Court is not persuaded that Plaintiffs have sufficiently shown copying.

## 2. *Read* Factor 2: Good-Faith Belief Regarding Defenses

The second *Read* factor asks whether the defendants, when they learned of the relevant patents, investigated their scope and formed a good-faith belief that the patents were invalid or not infringed. The Court finds that CH and Ruising investigated the scope of the Asserted Patents, but the Court is not convinced that that investigation vested in Defendants a good-faith belief that the patents were invalid or not infringed. The Court holds that CH and Ruising only gained that belief after offering good-faith invalidity and noninfringement defenses in response to Super Lighting's complaint.

The Court instructed the Jury of certain facts pertinent to Defendants' investigation. Specifically, that CH and Ruising learned about the '140 patent on February 16, 2019, and the '540 and '125 patents in July 2019, and that they took "no actions other than to retain litigation counsel for this case on or about November 12, 2020." ECF No. 226 at 20. The Court issued that instruction as a sanction, which Plaintiffs requested in response to inconsistencies in CH's

position regarding any opinions of counsel CH may have received related to the Asserted Patents. *See* ECF Nos. 176, 196. After the Court ordered that instruction from the bench, the parties negotiated its exact scope.

Some developments underlying that sanction are particularly relevant. Most notably, Defendants never substantively responded to Plaintiffs' discovery requests regarding Defendants' awareness of the Asserted Patents and any steps Defendants took once they gained that awareness. *See* ECF No. 176 at 3. Plaintiffs were surprised, then, to hear Jack Jiang, in a deposition conducted right before fact discovery closed, testify that he procured opinions of noninfringement and invalidity—covering Super Lighting's entire patent portfolio—from Chinese counsel in mid-2019, well before CH responded to Super Lighting's complaint. *Id.* Super Lighting filed suit against CH's customer, MaxLite, in the U.S. District Court for the Central District of California in May 2019, prompting Jack Jiang's investigation. *See id.* at 11 & n.15; *see also* Complaint, *Jiaxing Super Lighting Electric Appliance Co., Ltd. v. MaxLite, Inc.*, No. 2:19-cv-04047 (C.D. Cal. May 8, 2019). Guo Pengxin, CH's director in charge of quality and certification, apparently helped CH's Chinese counsel develop these opinions. ECF No. 176-2 at 83:15–24. Defendants consistently disclaimed any intent to use an opinion-of-counsel defense and—consistent with the Court's instruction to the Jury—presented no evidence of Jack Jiang's investigation to the Jury. The Court is not privy to the opinion of CH's Chinese counsel but what the Court has heard about it inspires little confidence that it was sufficiently competent to engender a good-faith belief of noninfringement in CH and Ruising. Defendants' waiver of the opinion-of-counsel defense further supports that suspicion.

The existence of the Chinese opinion does suggest that CH and Ruising were aware and concerned of the potential risks the Asserted Patents posed to Defendants' products. *Cf. Golden*

*Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1369 (Fed. Cir. 2006) (finding that incompetent opinions of counsel and surrounding facts are properly considered evidence of willfulness). The Jury heard that CH and Ruising personnel issued warnings that chips in CH's products had some "patent risk." *See* ECF No. 237 at 204:12–205:13; *see also* ECF No. 238 at 155:10–156:7 (discussing a SWOT analysis CH performed that suggested that its products were at risk, generally, for infringing patents). Those warnings were not specific to any of the Asserted Patents—but the products tagged with the "risk" label infringe the '140 patent, or so the Jury determined.

Shortly before it initiated this Action, Super Lighting attempted to notify CH that CH was infringing the Asserted Patents. On October 2, 2019, Super Lighting wrote to CH's CEO Caiying Gan and raised specific instances of CH's infringement of the Asserted Patents. *See* ECF No. 233 at 4. CH did not respond so Super Lighting wrote again on November 4, 2019. *See id.* CH was again silent. Super Lighting emailed Ms. Gan a third time on December 22, 2019. *See id.* Receiving no response, Super Lighting filed this Action in January 2020. CH did not respond to Super Lighting's complaint until December 2020, a month after it finally retained litigation counsel. *See* ECF No. 238 at 134:6–22, 145:2–10.

The Court instructed the Jury that, when evaluating Defendants' willfulness, it should consider whether Defendants had established a good-faith belief of non-infringement or invalidity. ECF No. 226 at 19–20. The Jury considered Defendants' evidence and nevertheless found CH's infringement to be willful. In this Court's opinion, that favors enhancement. *See Vectura Ltd. v. GlaxoSmithKline LLC*, No. CV 16-638-RGA, 2019 WL 4346502, at *4 (D. Del. Sept. 12, 2019) ("I agree that, in view of the willful infringement verdict, Defendants did not have a good-faith belief of noninfringement."); *Bio-Rad Lab'ys Inc. v. 10X Genomics, Inc.*, No.

15-CV-152-RGA, 2019 WL 3322322, at *10 (D. Del. July 24, 2019) (same), *vacated on other grounds*, 967 F.3d 1353 (Fed. Cir. 2020); *Alfred E. Mann Found. for Sci. Rsch. v. Cochlear Corp.*, No. CV 07-8108 FMO (SHX), 2018 WL 6190604, at *25 (C.D. Cal. Nov. 4, 2018) (finding that the jury considered evidence of the defendant's good faith but found it unpersuasive), *aff'd*, 798 F. App'x 643 (Fed. Cir. 2020). The Court finds little of the evidence above to weigh against enhancement under this factor.

### 3.  *Read* Factor 5: Closeness of the Case

The fifth *Read* factor concerns how "close" the case was.[2] This factor favors enhancement, although only slightly. The speed and lopsidedness of the Jury's verdict weighs in favor of enhancement while the fact that Defendants' defenses survived to trial weighs against enhancement.

The Jury returned a unanimous verdict in less than two hours of deliberating, concluding that Defendants infringe all the Asserted Patents, that the Asserted Patents were not invalid, and that CH and Ruising's infringement was willful. *See* ECF No. 279 at 40:12–13. As to damages, the Jury gave Plaintiffs exactly what they asked for. Other courts have enhanced damages based in part on the length of the jury's deliberations and the asymmetry of the outcome. *See, e.g.*, *EagleView Techs., Inc. v. Xactware Sols., Inc.*, 522 F. Supp. 3d 40, 52 (D.N.J. 2021); *Chamberlain Grp., Inc. v. Techtronic Indus. Co. Ltd.*, 315 F. Supp. 3d 977, 1014 (N.D. Ill. 2018). The Court will do the same here but to some lesser degree, appreciating that this Jury's workload was relatively light, which could account for the brief deliberations. As to core issues, they only had to decide direct infringement for a single product and invalidity for two of the three Asserted Patents.

---

[2] The Court takes this *Read* factor out of order, finding it related to the second factor.

Plaintiffs contend that this factor more heavily favors enhancement because "virtually every argument CH presented was exposed as a sham." ECF No. 233 at 17. The Court disagrees with the premise. Plaintiffs most compelling evidence on this point is CH's stipulation to infringement for most of the accused products at a late stage in this Action, after the parties had already prepared expert reports. To be sure, that stipulation is weighty—this would have been a closer case had CH presented a non-frivolous noninfringement theory at trial. As this Court put it during oral arguments: "[I]f you're going to trial, would you rather have a noninfringement defense or an invalidity defense? I don't think anyone would pick, in most cases, the invalidity defense as what they would want to be their lead defenses." ECF No. 279 at 66:21–67:2. Yet CH's stipulation does not render the other defenses CH presented at trial a "sham." If they were baseless, Plaintiffs could have convinced this Court to dispose of this Action at summary judgment. They did not even try—the Court did not receive any motions for summary judgment as to the infringement or invalidity issues CH presented to the Jury. Accordingly, the Court is not inclined to deem CH's trial defenses baseless.

The Court cannot avoid remarking on the pre-verdict JMOL that disposed of CH's invalidity case as to the '125 patent. Super Lighting contends that this is a "true rarity in a patent case" and remarks on how it warned CH before trial that CH did not have sufficient evidence to mount an invalidity defense as to the '125 patent. ECF No. 233 at 18. The nature of the JMOL ruling attenuates its impact under this factor. In rendering this ruling, the Court did not opine upon the merits of the prior art combination CH proffered; it only determined that defense counsel did not get critical system art—or representative pictures—into evidence before Defendants closed their case. *See* ECF No. 239 at 47:8–53:9; *cf. Wapp Tech Ltd. P'ship v. Seattle SpinCo, Inc.*, No. 4:18-CV-469, 2021 WL 1574714, at *3 (E.D. Tex. Apr. 22, 2021)

(upholding willfulness verdict despite JMOL dismissing invalidity defense because the JMOL sprung from the defendant's bad time management and not merits of the defense). If that evidentiary snafu was inevitable, as Plaintiffs seem to suggest, Plaintiffs would (or should) have raised it with the Court *before* reaching trial—saving everyone time, energy, and resources. Their failure to do so speaks volumes.

In addition, the impact of the JMOL ruling is diminished given that it resolved invalidity for only one patent—it did not undercut theories applied to the two other Asserted Patents. Plaintiffs allege that the prior art tubes that Plaintiffs could not authenticate were "the heart of [Defendants'] invalidity case." ECF No. 279 at 24:21–23. But the Court agrees with Defendants that "the bulk of the case related to the '140 patent." ECF No. 247 at 5. The distribution of asserted patent claims bears that out, as does, as the Court describes later, much of the discussion around the preliminary injunction focused on the shock-protection offered by the '140 patent's invention. *See infra* IV.B.2.

Also relevant is Defendants' decision to drop its inequitable conduct claims by stipulation right before trial. ECF No. 233 at 6. The number of meritorious defenses levied against an ultimately successful infringement claim may speak to the closeness of a case. Generally, the more defenses, the closer the case. On the other hand, when defenses fall away, a case may become less close. CH's inequitable conduct claims were so important to CH, it issued a press release describing how it was able to add them to its answer. *See infra* Section II.B.9. And though Defendants now conveniently argue that they dropped those inequitable conduct allegations because they "were most strong with respect to the" five patents that Plaintiffs dropped before trial, ECF No. 279 at 68:2–6, Defendants were not so careful to distinguish the strength of their inequitable conduct allegations patent-by-patent when issuing a press release for

the market's review. The Court finds that dropping such an ostensibly significant defense *must* mean that the case became less close.[3] But because the defenses Defendants presented at trial were not frivolous, the Court is not convinced that dropping the inequitable conduct claim had a substantial impact under this factor.

None of the other gripes Plaintiffs raise under this factor are particularly persuasive. First, Plaintiffs ding Dr. Zane, Defendants' noninfringement expert, for resting his noninfringement position as to the LT2600 on mere criticism of the infringement opinion of Dr. D'Andrade, Plaintiffs' expert. ECF No. 233 at 17. The Court agrees with CH, however, that Dr. Zane analyzed the same documents and testing Dr. D'Andrade analyzed to draw a conclusion contrary to Dr. D'Andrade. ECF No. 247 at 4. Dr. Zane did not have to "conduct his own reverse engineering" to make this a close case (though it certainly would have helped). *Id.*

Second, Plaintiffs claim that CH deprived its technical experts of evidence of CH's copying and those same experts ignored evidence of commercial success. ECF No. 233 at 17. As to copying, CH states that it was Super Lighting's burden to prove copying as a secondary consideration of non-obviousness and CH's experts did not need to consider such evidence, especially where Super Lighting's expert did not even opine on that fact. ECF No. 247 at 6. CH's position is persuasive.

Third, Plaintiffs allege that CH's strongest defense constituted an obvious combination involving art the U.S. Patent and Trademark Office (USPTO) had already considered. ECF No. 233 at 17. Yet there is no evidence that the USPTO considered CH's combinations (or even a

---

[3] For comparison, CH argues that this Court must consider Super Lighting dropping several infringement claims pretrial, including one on which Defendants moved for summary judgment. ECF No. 247 at 6. The Court does not find, and Defendants have not sufficiently explained, how Super Lighting dropping several patents from this Action speaks to how close the case was as to the patents that made it to trial.

sufficiently comparable combinations). *See* ECF No. 247 at 4. The Court will not find that this case is not close merely because the USPTO reviewed one reference in an infringer's obvious combination.

This factor favors enhancement in view of the Jury's quick and lopsided decision. The Court will also not deny that Defendants' dropping their noninfringement case right before trial weighs in favor of enhancement. But this factor does not tilt overwhelmingly in Plaintiffs' favor at least because Defendants put on an invalidity case (and noninfringement for one product) at trial that was not frivolous or even exceptionally weak.

    4.    *Read* Factor 3: Infringer's Litigation Behavior

The third *Read* factor concerns the infringers' behavior as a party to the litigation. The Court's analysis of this factor overlaps significantly with its exceptionality analysis under § 285, above. As explained more thoroughly there, the Court finds that Defendants behaved unreasonably in several instances. *See infra* Section III.B.

    5.    *Read* Factor 4: Defendant's Size and Financial Condition

The fourth *Read* factor asks the Court to evaluate Defendants' size and financial condition. CH contends that trebling damages to $42 million "would profoundly impact CH's business and production. In fact, trebling the damages would ***exceed*** the incremental profit CH made from any infringing sales by almost $10 million." ECF No. 247 at 18. CH has not represented that trebling would drive it out of business and Plaintiffs remark that "CH made more than double that $42 million by continuing to infringe." ECF No. 255 at 8. In addition, the Court does not consider CH and Ruising an unsophisticated party as it pertains to legal matters; Jack Jiang testified that their Chinese counsel is a "famous law firm that we have been working with for about seven or eight years." ECF No. 176-2 at 66:9–14. This factor does not discourage the Court from enhancement.

### 6. *Read* Factor 6: Duration of Defendant's Misconduct

The sixth *Read* factor asks the Court to consider the duration of Defendants' misconduct. It seems to this Court that CH and Ruising were concerned enough about the threat the Asserted Patents posed that they sought an opinion from Chinese counsel in mid-2019. *See supra* Section II.B.2. They nevertheless continued infringing and have not stopped yet. The Court is dubious that Super Lighting's pre-suit emails to CH's CEO did not give CH and Ruising actual notice of their infringement. Indeed, Jack Jiang's pre-suit investigation may suggest that CH and Ruising knew of their infringement risk *before* those notice letter. Nevertheless, this factor does not weigh heavily in favor of enhancement because Super Lighting likely only knew for less than 18 months, if that. *WCM Indus., Inc.*, 721 F. App'x at 973 (holding that the duration of misconduct likely weighs against enhancement where the patents issued a short time before the filing of the lawsuit).

### 7. *Read* Factor 7: Remedial Actions

The seventh *Read* factor concerns whether Defendants took remedial action. As other courts have explained, this factor concerns "whether conduct during the pendency of the suit evinces an unrepentant defendant." *Acantha LLC v. DePuy Synthes Sales Inc.*, 406 F. Supp. 3d 742, 761 (E.D. Wis. 2019); *Creative Internet Advert. Corp. v. Yahoo! Inc.*, 689 F. Supp. 2d 858, 869 (E.D. Tex. 2010) ("This factor looks to whether the defendant ceased the sale of the infringing product during the pendency of the litigation."). CH all but concedes it has taken no remedial action but excuses itself on the ground that it has asserted good-faith defenses and will continue to do so in post-verdict motions and on appeal. ECF No. 247 at 19 (citing *Acantha*, 406 F. Supp. 3d at 761). That excuse, at least as to post-verdict conduct, holds little weight here. It is difficult for Defendants to maintain a good-faith belief that they do not infringe until either this

Court, or a higher court, vacates the Jury's verdict. Or at least the Court will presume as much given that a jury verdict considerably narrows their ability to ultimately prevail in this dispute.

        8.     *Read* Factor 8: Defendant's Motivation

The eighth *Read* factor asks whether the Defendants were motivated to harm Plaintiff. Super Lighting contends that its status as CH's archrival motivated CH to harm Super Lighting by committing infringement. ECF No. 233 at 20. The Court is persuaded that the competition between Super Lighting and CH is fierce; it drove CH to poach Jack Jiang from Super Lighting by offering "unusually large benefits"—a rent-free house, a free office, and the power to run Ruising. *Id.* at 1, 20. Moreover, CH produced Super Lighting's confidential documents—testing reports—relating to lamp tubes. *Id.* at 2. CH never explained why it had those documents. *Id.* at 2. All it could say was that some of them were dated after Jack Jiang and Jun Yang arrived at CH. *See* ECF No. 241 at 2 n.2. CH could not explain away Jack Jiang's possession of CH's customer lists, though. ECF No. 233 at 2. All this leads to a conclusion that CH and Super Lighting were rivals, potentially even "archrivals," and indicates CH *did* have a motivation to harm Super Lighting.

The notion that "infringement by a direct competitor in [a small] market mitigates in favor of enhanced damages," *TruePosition Inc. v. Andrew Corp.*, 611 F. Supp. 2d 400, 412 (D. Del. 2009), *aff'd*, 389 F. App'x 1000 (Fed. Cir. 2010), is compelling here. *EagleView Techs., Inc. v. Xactware Sols., Inc.*, 522 F. Supp. 3d 40, 54 (D.N.J. 2021). "Additionally, courts are even more willing to find that this factor should enhance damages when 'the evidence supports the conclusion that [the infringer] preferred taking the risk of infringement over designing a non-infringing device.'" *Id.* (quoting *Polara Eng'g, Inc. v. Campbell Co.*, 237 F. Supp. 3d 956, 994 (C.D. Cal. 2017), *aff'd in part, vacated in part on other grounds*, 894 F.3d 1339 (Fed. Cir. 2018)). CH stipulated to infringement and continued infringing. The Jury found CH liable for

infringement—even willfully so—and yet CH has continued infringing. Even if the Court found that CH was not motivated to harm Super Lighting, CH's continued infringement evinces at least a reckless disregard for the harm it has and continues to cause to a rival. The Court therefore finds that this factor favors enhancement.

9.   *Read* Factor 9: Infringer's Concealment

The final *Read* factor concerns whether Defendants attempted to conceal their misconduct. The Court agrees with CH that CH openly sold the accused products, and continues to do so, without any attempt to physically conceal the infringing components. And Plaintiffs adduce no evidence that CH kept any data about infringing sales back. Indeed, it seems the parties are continuing to keep an account of those sales.

The Court must also consider, however, CH and Ruising's withholding information relevant to willfulness—specifically, Jack Jiang's investigations into Super Lighting's patent portfolio in mid-2019—until late in the case. Moreover, the Court finds that CH and Ruising meant to improve their post-complaint market position by publicly obfuscating their true infringement risk. For example, this Court, after finding that adding claims of unclean hands and inequitable conduct would not be futile, granted Defendants leave to amend their answer to Super Lighting's complaint. *See* ECF No. 162. Yet Jack Jiang took to WeChat, a popular social platform in China, and described that ruling as an "acknowledgement that [Super Lighting's] patents were acquired illegally." *See* ECF No. 233 at 12. That is a misrepresentation of this Court's order. *See* ECF No. 137 at 40:23–41:3 (discussing this issue when first raised). Jack Jiang and his counsel at Radulescu LLP also issued a press release through a proxy, in which they described the Court's ruling on the amendment in more accurate terms. ECF No. 233-5. That release, however, outlined CH's inequitable conduct theory in great and salacious detail. One would think from reading the announcement that Radulescu had unearthed a smoking gun,

painting a generous picture. In reality, CH's inequitable conduct theory as to the Asserted Patents would not survive to trial. ECF No. 233 at 6.

          10.    <u>Conclusion</u>

The Court finds that this case is egregious and therefore enhancement is warranted here based on: the Jury's willfulness finding; the fact that this case was not very close; CH and Ruising's disregard for their discovery obligations; Jack Jiang's mischaracterization of this Court's ruling regarding inequitable conduct; Jack Jiang and Radulescu's glowing press release; and CH and Ruising's motivation to harm Plaintiffs. The Court finds that doubling the damages award is adequate punishment for the level of culpability CH and Ruising have shown. Yet the Court finds it unjust to apply that multiple to an award covering the entire damages period. "Culpability . . . is generally measured against the actor's knowledge at the time of the challenged conduct." *Halo*, 579 U.S. at 114. As indicated above, the Court is satisfied that Defendants developed a good-faith belief that they were not infringing by the time they filed an answer to Plaintiffs' complaint. Accordingly, the Court will not cognize Defendants' infringement as willful or culpable for the period between filing an answer and receiving an adverse jury verdict. The Court will not multiply any damages attributed to CH and Ruising accrued during that period.

That said, a defendant "cannot insulate itself from liability for enhanced damages by creating an (ultimately unsuccessful) invalidity defense for trial." *WBIP*, 829 F.3d at 1340. As such, damages that CH and Ruising accrued outside that period, and after CH and Ruising first learned of the Asserted Patents—that is, the date CH and Ruising learned of the '140 patent according to the jury charge—will be doubled. *See Stryker Corp. v. Davol Inc.*, 234 F.3d 1252, 1260 (Fed. Cir. 2000) (affirming a tailored approach to enhancing damages based on culpability during a given period). The Court finds that the date CH and Ruising learned of the '140 patent

is an appropriate starting point given the Court's instruction as to CH and Ruising's awareness of the Asserted Patents, the Jury's unbounded willfulness finding, and Jack Jiang's admissions regarding the timing of his pre-suit investigation regarding the Asserted Patents.

### III. ATTORNEYS' FEES

Plaintiffs' Motion for Attorneys' Fees, ECF No. 241, is **DENIED**.

#### A.    Legal Standard

##### 1.    35 U.S.C. § 285

Pursuant to the Patent Act, in "exceptional cases," a district court "may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. An "exceptional case" is "simply one that stands out from others with respect to the substantive strength of a party's litigating position . . . or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).

District courts must determine whether any particular case is "exceptional" in a "case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* Whether a case is "exceptional" or not "is a factual determination," *Forcillo v. Lemond Fitness, Inc.*, 168 F. App'x 429, 430 (Fed. Cir. 2006), and the court must make its determination by a "preponderance of the evidence," *Octane Fitness*, 572 U.S. at 558 (rejecting the prior requirement that a patent litigant establish its entitlement to fees under § 285 by "clear and convincing" evidence).

In assessing the "totality of the circumstances," courts may consider factors such as "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 554 n.6 (citing *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.9 (1994) (addressing a similar fee-shifting provision in the Copyright Act)). A party's conduct need not be independently sanctionable to warrant an award of fees under § 285; however, fee awards should

not be used "as a penalty for failure to win a patent infringement suit." *Munchkin, Inc. v. Luv n'*
*Care, Ltd.*, 960 F.3d 1373, 1378 (Fed. Cir. 2020) (quoting *Octane Fitness*, 572 U.S. at 548).

>    2.    28 U.S.C. § 1927

Under 28 U.S.C. § 1927, "[a]ny attorney or other person admitted to conduct cases in any
court of the United States . . . who so multiplies the proceedings in any case unreasonably and
vexatiously may be required by the court to satisfy personally the excess costs, expenses, and
attorneys' fees reasonably incurred because of such conduct." Conduct is "unreasonable and
vexatious" "if there is evidence of the persistent prosecution of a meritless claim and of a
reckless disregard of the duty owed to the court." *Morrison v. Walker*, 939 F.3d 633, 637–38 (5th
Cir. 2019) (quotations omitted). Under § 1927, a court may award attorney fees, costs, and
expenses that were "reasonably incurred" because of the attorney's misconduct. *Id.* at 637.

>    **B.    Discussion**

Plaintiffs take a kitchen-sink approach to argue their entitlement to attorneys' fees. As a
threshold matter, the Court appreciates the Jury's willfulness determination but, again, that is not
dispositive of Plaintiffs' entitlement to fees under § 285. *SiOnyx LLC v. Hamamatsu Photonics*
*K.K.*, 981 F.3d 1339, 1354 (Fed. Cir. 2020). The Court starts with what it considers the most
uncommon conduct: CH and Ruising's disregard for their discovery obligations;
misrepresentations made to the public regarding this Court's order on inequitable conduct; and
Defendants' failure to put its system prior art into evidence. It then moves to conduct the Court
finds less objectionable. The Court concludes that "the [Jury]'s finding of willful infringement is
not determinative of whether [this] case is exceptional under § 285, and that [Defendants']
litigation conduct was consistent with an aggressive," and sometimes inept, "defense but was not
otherwise uncommon or exceptional." *Id.*

1. <u>Defendants' Objectionable Litigation Conduct</u>

a. *Defendants' Discovery Obligations*

Plaintiffs adduced evidence suggesting Defendants harbored a disregard for its discovery obligation in this Action. Plaintiffs highlighted this disregard for the Court during a discovery hearing on July 12, 2021, in which Plaintiffs identified discrepancies that arose when deposing key CH and Ruising witnesses. *See* ECF No. 137.

For example, Plaintiffs deposed Caiying Gan, at which point it become evident that she had not searched for any documents pertinent to this Action—despite her position as CH's CEO. *See id.* at 28:6–30:11. Indeed, she testified that no one had asked her to search for *or preserve* any relevant documents.[4] *Id.*

Plaintiffs also deposed Jack Jiang, who revealed that he procured opinions on the Asserted Patents in mid-2019. *See supra* Section II.B.2. This was the first Plaintiffs learned of

---

[4] Plaintiffs also contend that CH engaged in spoliation of evidence because, although Caiying Gan confirmed that Super Lighting sent notice letters to her email address, she could not locate them when conducting a search of her email account, at Super Lighting's counsel's request, during her deposition. ECF No. 233 at 10; ECF No. 241 at 8–9. Plaintiffs assert that Ms. Gan's email account does not have an auto-delete function, so the only explanation for why she could not find the notice letters is because someone deleted them. ECF No. 233 at 10; ECF No. 241 at 8–9.

Defendants counter that, Ms. Gan, who testified that she does not read any of her emails, was given fifteen minutes to perform an "inexpert search" for an eighteen-month-old email, written in a language she does not understand, all while she was experiencing technical difficulties *and* being asked questions by Super Lighting's counsel. ECF No. 247 at 8. Yet the Court notes that Jun Yang, Ruisang personnel, testified that he could not find the notice letters when he searched Ms. Gan's email on her phone yet found it when searching the computer of another CH employee. ECF No. 237 at 207:12–208:2. The Court is, therefore, dubious that Ms. Gan's inability to locate Plaintiffs' letters under challenging circumstances leads to the conclusion that CH must have deleted these notice letters. Nor is the Court confident in the thoroughness of Jun Yang searching Ms. Gan's phone. The Court further agrees with CH that, "If Plaintiffs genuinely believed that such conduct gave rise to a spoliation claim, they should have sought a spoliation instruction." *Id.* In stating that, the Court is not finding that CH did not have pre-suit notice of the Asserted Patents or their infringement, through the emails or otherwise. Indeed, the Court finds it more likely than not that CH had that notice.

anything approaching a formal investigation into the Asserted Patents, despite having served discovery requests that should have elicited this information much earlier in the case. *See id.* When asked why Defendants had not produced anything related to this opinion, Mr. Jiang stated: "It's very simple. No one asked us about it. And we also didn't know what documents we were supposed to provide." ECF No. 176-2 at 67:9–15. Mr. Jiang also testified the Guo Pengxin, director in charge of quality and certification for CH, helped outside counsel develop these opinions. *Id.* at 83:15–24. Yet Guo Pengxin denied any involvement in any such opinions; Mr. Jiang supposed that Mr. Pengxin was mistaken, likely a result of stress and concern "that [he] might lose [his] job" if the deposition did not go well. *Id.* at 83:25–85:10. This inconsistency adds to the Court's concern.

The Court heard arguments regarding Ms. Gan and Mr. Jiang's testimony and Defendants' failure to meet their discovery obligations and ordered additional document productions and more time for Plaintiffs to depose Ms. Gan and Mr. Jiang. ECF No. 137 at 27:11–18, 33:14–35:3. At that time, the undersigned refused to shift the costs for the additional depositions to Defendants. *Id.* at 37:3–23. Nevertheless, Defendants' disregard for their discovery obligations is troubling.[5]

---

[5] Plaintiffs raise other discovery-related issues of lesser concern that the Court dealt with in short order. For example, the Court: excluded documents that Defendants produced from Lumixess and Maxlite; and excluded a late-identified Maxlite witness. *See* ECF No. 233 at 11; ECF No. 241 at 11–12. Plaintiffs also remark how CH initially withheld gross profit numbers for the accused lamps, stating that it did not track such numbers, before ultimately producing them. ECF No. 233 at 10; ECF No. 241 at 9. The Court is satisfied with Defendants' contention that translation issues caused this misunderstanding, ECF No. 251 at 8–9, and that Defendants' counsel undertook a reasonable investigation as to this information, ECF No. 279 at 94:8–25.

b.    *Jack Jiang's Public Statements*

At the same hearing, the Court expressed concern with Jack Jiang making public statements that did not accurately characterize this Court's ruling on Defendants' inequitable conduct claims. *Id.* at 40:23–41:3. That too is concerning.

c.    *The Court's JMOL*

Maybe the most extraordinary example of Defendants' conduct were the events surrounding the Court's ruling, in the middle of trial, that Defendants had failed to prove invalidity as to the '125 patent and one of two grounds of the '540 patent, all of which rested on tube lamps that were purported to be prior art. Dr. Lebby, Defendants' invalidity expert, propounded these invalidity grounds and testified that he had no personal experience with those tubes and he had not personally inspected them prior to issuing his report. *See* ECF No. 241 at 6. Rather, he had been provided photographs of teardowns of the prior art tubes; he did not know who took the photographs, when or where they were taken, or the qualifications of the person performing the teardown[6]. *See id.*

At 7:00 PM the night before Dr. Lebby's trial testimony, CH served over 100 demonstratives containing new, never-before-disclosed photographs of the prior art tubes, along with (apparently) relevant commentary. *See* ECF No. 241 at 13. Defendants contend that Dr. Lebby needed these photos for demonstrative purposes because the tube lamps were proving "unwieldy." ECF No. 251 at 14–15. That excuse holds little water where Defendants already had

_____

[6] The parties hotly debated the source of the photographs. At trial, Defendants alleged that they had an affidavit showing that Defendants' former counsel at Radulescu LLP took the photographs, but the affidavit only shows that possession of the physical tubes themselves passed from Radulescu to Defendants' current counsel. *See* ECF No. 241 at 13; ECF No. 244-7. The Court also *limined* out any suggestion that the person who took the photographs had a criminal record, which was a line of question down which Plaintiffs took Dr. Lebby during his deposition. *See* ECF No. 159 at 3.

photographs of the tubes—the photographs Dr. Lebby's report relied on in place of the physical tubes themselves. The Court finds it more likely that Defendants may have been intending shore up issues related to authenticating the photographs in Dr. Lebby's report. Yet the morning of Dr. Lebby's testimony, CH quickly agreed that it would not use the new photographs. ECF No. 238 at 32:3–7. It did so with almost no argument, to the great surprise of Plaintiffs' counsel who had likely spent significant time—late at night and into the early morning—reviewing and preparing to respond to the new photographs and any attached commentary. *Id.* at 32:9–33:8. Thus, the new photographs wasted Plaintiffs' counsel time in the middle of trial and accomplished *nothing* else. ECF No. 241 at 13 ("This overhaul of Dr. Lebby's opinions, which Super Lighting detailed for the Court in the wee hours of the morning, forced Super Lighting['s] counsel to stay up all night and was clearly done to prejudice Super Lighting's cross-examination."); ECF No. 279 at 19:2–6 ("Mr. Reid and others on our team spent the entire night going through everything.").

Once Dr. Lebby took the stand, he commented on the photographs in his report but Defendants never introduced them as evidence. *See* ECF No. 241 at 7. So when Super Lighting sought JMOL on the alleged prior art products, CH was unable to point to any record evidence supporting its invalidity case as to the '125 patent and one ground of the '540 patent. The Court granted JMOL. *See id.*

Defendants' counsel's conduct through this chain of events was not reasonable. It shows a disregard for opposing counsel's time and a lack of diligence regarding evidentiary issues in the face of relevant warnings from opposing counsel. *See* ECF No. 233 at 18 (alluding to a pre-trial warning letter).

2. Defendants' Other Litigation Conduct

a. *Dropped Defenses*

Plaintiffs contend that counterclaims and defenses to infringement that Defendants eventually dropped were "meritless." The Court cannot agree. First are the noninfringement opinions that CH's experts, Dr. Zane and Dr. Lebby, prepared before CH dropped those defenses. *See* ECF No. 241 at 5–6; ECF No. 152 at 20:15–22:9 (reading the narrowing agreement into the record). Plaintiffs take umbrage with Dr. Zane's dropped noninfringement theories as to the '140 patent, which relied on an interpretation of the claims that Dr. Zane admitted would exclude preferred embodiments.[7] ECF No. 241 at 5. Certainly, courts should "interpret claim terms in a way that excludes embodiments disclosed in the specification" only in rare circumstances. *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008); *Elekta Instrument S.A. v. O.U.R. Sci. Int'l, Inc.*, 214 F.3d 1302, 1308 (Fed. Cir. 2000). It is not clear to the Court whether this is that rare case. That is, it is not "apparent from the face of [the] patent" whether this noninfringement defense is reasonable or unreasonable. *Halo*, 579 U.S. at 114 (Breyer, J., dissenting).

Second is CH's inequitable conduct defense: "CH filed over 150 pages of inequitable conduct allegations against Super Lighting, claiming everything from deliberate withholding from the PTO to improper inventors." ECF No. 241 at 4. Super Lighting argues that aspects of that defense turned on "trivialities" and forced Super Lighting: to respond to CH's motion to amend the inequitable conduct counterclaims into the case; to answer those counterclaims; and to address them in its validity expert report. *Id.* at 5. Only then did CH drop those allegations.

---

[7] Plaintiffs further contend that Dr. Zane admitted his interpretation would make the '140 patent impossible to practice but the Court cannot discern any such admission in Dr. Zane's deposition transcript. *See* ECF No. 241-7 at 86:10–17, 87:4–20.

Defendants respond that it was not a coincidence that Plaintiffs "dropped most of the patents targeted by those allegations" at the same time. ECF No. 251 at 8. Plaintiffs reply that it did not drop those patents because "of any particular defenses." ECF No. 271 at 3. The more salient point, in this Court's estimation, is that CH "abandoned its opportunity to assert unclean hands or inequitable conduct, not just against the patents" that Plaintiffs dropped, but also against "the three patents that were presented to the jury." *Id.* at 4.

The Court is cognizant that "the mere fact that an issue was pleaded and then dropped prior to trial does not in itself establish vexatious litigation" supporting a finding of exceptionality. *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989); *see also Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH*, 603 F.3d 943, 959 (Fed. Cir. 2010) ("A decision by a party to narrow its case for presentation to a jury does not generally suggest manipulation of the litigation process."). Plaintiffs have not persuaded this Court that Defendants' dropped claims and defenses were objectively unreasonable. *See Mach. Corp. of Am. v. Gullfiber AB*, 774 F.2d 467, 471 (Fed. Cir. 1985) ("[O]ne should not be penalized for merely defending or prosecuting a lawsuit."). Dr. Zane's theory regarding the '140 patent is troubling but it is a challenge to adjudge its merits in this limited context. It is telling that Plaintiffs were not confident enough in the alleged weakness of Dr. Zane's theory to move for summary judgment on the issue.

Beyond that, the Court detects no motive from the circumstances surrounding the claims or defenses, such as the timing of CH's streamlining, that would suggest that CH committed litigation misconduct. *Cf. Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 209 (2016) (holding, in the context of a fee-shifting statute for copyright claims, tat "a court may order fee-

shifting because of a party's litigation misconduct, whatever the reasonableness of his claims or defenses").

                    b.    *Delay & Avoid*

Plaintiffs contend that CH and its original counsel schemed to delay this Action and/or avoid litigating it in this District. For that proposition, Plaintiffs rely on what if refers to as the "DELAY and AVOID" email, in which CH's original counsel, David Radulescu from Radulescu LLP, told Jack Jiang that he was evaluating whether: CH could avoid litigating this dispute in Texas or the United States altogether; or CH could delay litigating in Texas for more than a year if Super Lighting fails to serve CH. *See* ECF No. 233 at 5; ECF No. 241 at 4. Even if CH interpreted the email as offering advice or instruction—as opposed to a status update—and even if CH followed through on it, the suggested course of conduct is not far from standard operating procedure for foreign defendants in a patent infringement case. Counsel does not cross any ethical boundaries by recommending that its client avoid forums counsel perceives as unfavorable.[8] Nor is it, as a general proposition, improper for a foreign defendant to insist that plaintiff serve it via the Hague Convention. *See* ECF No. 266 at 12–13; *Sheets v. Yamaha Motors Corp.*, 891 F.2d 533, 537 (5th Cir. 1990) ("Thus, because the service that plaintiff attempted fell squarely within the scope of Hague Convention, insisting on service pursuant to its provisions was warranted by existing law."). CH was not "dodging" service, as Super Lighting would have this Court believe. Under Plaintiffs' rationale, an attorney acts unethically whenever it advises its client to reject a request to waive service or whenever it opposes a motion for leave to effect

---

[8] Indeed, the U.S. Court of Appeals for the Federal Circuit has recently reinvigorated 28 U.S.C. § 1404(a), all but encouraging accused infringers to seek transfer to venues some perceive to be more favorable.

alternative foreign service, thereby prolonging litigation. *See* ECF No. 255 at 3 (citing Texas Disciplinary Rule of Professional Conduct 3.02). The Court disagrees.

At trial, Plaintiffs attempted to impeach Mr. Jiang after he testified that CH did not have "a strategy of dodging service and avoiding litigation in Texas." ECF No. 233 at 5; ECF No. 241 at n.5. Plaintiffs posited then, as they do now, that the "DELAY and AVOID" email contradicts Mr. Jiang's testimony—that Plaintiffs caught Jack Jiang "lying on the witness stand." ECF No. 233 at 5; ECF No. 255 at 1. That is a step too far.

First, Super Lighting's briefing does not accurately characterize Mr. Jiang's testimony. Neither counsel's question nor Mr. Jiang's answer are directed to "dodging" service or delay. Super Lighting's counsel asked Mr. Jiang whether Defendants "have a strategy of – of avoiding being forced to litigate in Texas after you were sued." ECF No. 238 at 148:13–16. Mr. Jiang replied: "That is not the case at all." *Id.* at 148:22. Mr. Jiang could not be caught lying on the stand about dodging service or delaying this Action because he did not testify to either issue.

Second, the "DELAY and AVOID" email is not evidence that CH had a strategy of avoiding litigating this Action in Texas, making Mr. Jiang a liar. The "DELAY and AVOID" email merely reflects that Radulescu was "evaluating potential options" to avoid Texas. *See* ECF No. 233 at 5. That is not evidence of Radulescu's ultimate recommendation on the issue—and even if it was, there is no evidence that CH or Jack Jiang adopted that recommendation. To the contrary, CH did not move to dismiss this Action on jurisdictional or *forum non conveniens* grounds or seek transfer to a more convenient forum. *See* ECF No. 279 at 90:20–91:10 (explaining that by "avoid," Mr. Radulescu meant contemplating the propriety of this Court's jurisdiction over CH). If Defendants' strategy was to avoid litigating in Texas, the Court cannot

discern what steps they took to implement it. For the foregoing reasons, the Court is not convinced that this email or Mr. Jiang's subsequent testimony amounts to misconduct.[9]

### c. *Trial Conduct*

Plaintiffs next point to CH's attempts to use documents related to CH's withdrawn inequitable conduct claims. ECF No. 233 at 13–14; ECF No. 241 at 12–13. The Court excluded reference to those documents several times during trial but finds no malice of bad faith in Defendants' attempts to divine whether those documents could be used to support claims or defenses unrelated to inequitable conduct. Plaintiffs also identified in CH's exhibit list an exhibit that the Court had excluded—but CH quickly rectified that issue. ECF No. 233 at 13; ECF No. 241 at 12–13. Again, the Court will not attribute this mistake to malice.

### 3. Conclusion

Considering the totality of the circumstances, the Court finds that this case is not exceptional. Defendants committed missteps but they did not "present false testimony, or destroy documents like the cases reviewed and deemed to be exceptional by the Federal Circuit." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, No. 2:14-CV-00912-JRG, 2020 WL 1478396, at *3 (E.D. Tex. Mar. 26, 2020) (citing *SFA Sys., LLC v. Newegg Inc.*, 793 F.3d 1344, 1350–52 (Fed. Cir. 2015)). "What constitutes an exceptional case should not become part and parcel of losing a hard-fought and contentious trial." *Id.* at *4 (citing *Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 858 F.3d 1371, 1376 (Fed. Cir. 2017)). The Court will not award Plaintiffs fees just because

---

[9] Which is not to say that this email does not present other concerns, most notably that CH did not retain litigation counsel for this Action until November 2020, when they retained Radulescu. *See* ECF No. 279 at 10:10–11:10; ECF No. 248 at 135 ("[A]fter we became aware of the – litigation or the situation, it took some time for us to find a trustworthy law firm here in the U.S."). The "DELAY and AVOID" email chain from early 2020 suggests that Radulescu was advising CH on this Action months earlier.

this Action was unnecessarily contentious and Defendants ultimately lost on all issues. And while Defendants may have conducted themselves in an unreasonable manner on certain issues and approached exceptional territory, the Court does not conclude this rendered the "overall" case exceptional. *See Intellectual Ventures I LLC v. Trend Micro Inc.*, 944 F.3d 1380, 1384 (Fed. Cir. 2019). For similar reasons, the Court denies Plaintiffs' request as to § 1927.

### IV. PERMANENT INJUNCTION

Plaintiffs' Motion for a Permanent Injunction, ECF No. 234, is **DENIED**. Plaintiffs have failed to satisfy the irreparable injury factor, among others.

#### A.    Legal Standard

District Courts may enter a permanent injunction to restrain a party from patent infringement "in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. There are four findings the Court must make when deciding to issue an injunction: (1) that the plaintiff has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for the injury; (3) that, considering the balance of hardships between the parties, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "The movant must prove that it meets all four equitable factors[,] [a]nd it must do so on the merits of its particular case." *Nichia Corp. v. Everlight Ams., Inc.*, 855 F.3d 1328, 1341 (Fed. Cir. 2017) (citations omitted).

#### B.    Discussion

To make a showing of irreparable injury supporting a permanent injunction, Super Lighting must show both that (1) it will suffer irreparable harm absent an injunction, and (2) a sufficiently strong causal nexus relates the alleged harm to the alleged infringement. *Apple Inc.*

*v. Samsung Elecs. Co.*, 735 F.3d 1352, 1359–60 (Fed. Cir. 2013) (hereinafter *Apple III*). "[T]he causal nexus requirement is simply a way of distinguishing between irreparable harm caused by patent infringement and irreparable harm caused by otherwise lawful competition." *Id.* at 1361. Defendants take little issue with the proposition that Plaintiffs have suffered harm through competing with CH. Rather, Defendants claim there is no causal nexus relating that harm to patent infringement. The Court agrees.

### 1. Irreparable Harm Absent an Injunction

Plaintiffs' threshold premise is that Super Lighting and CH are direct competitors, which "weighs heavily in favor of a finding of irreparable injury." ECF No. 234 at 8 (first quoting *i4i Ltd. P'ship v. Microsoft Corp.*, 670 F. Supp. 2d 568, 599 (E.D. Tex. 2009); then citing *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013); then citing *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1338 (Fed. Cir. 2013); and then citing *Novozymes A/S v. Genencor Int'l, Inc.*, 474 F. Supp. 2d 592, 612-13 (D. Del. 2007)). Defendants do not deny Plaintiffs' characterization of Super Lighting and CH as direct competitors. Plaintiffs go further, however, in describing CH as an "archrival" to Super Lighting, citing CH's hiring Jack Jiang away from Super Lighting, and Jack Jiang's subsequent hiring of Jun Yang away from Super Lighting. *Id.* at 9. Plaintiffs portray this activity, along with, for example, CH's possession of Super Lighting's confidential internal testing reports, as evidence of a "scheme to usurp Super Lighting's technology and take down Super Lighting's business." *Id.* They go as far as to allege that CH stole Super Lighting's technology and implemented it in its infringing products. *Id.* at 9–10.

Plaintiffs name the specific economic harms CH's infringement has inflicted upon Super Lighting: lost sales, lost profit margins, and lost market share. First, Super Lighting argues that it lost sales to CH, citing testimony from Super Lighting's own witnesses. ECF No. 234 at 10.

Plaintiffs adduced evidence that Super Lighting made 84% its sales during the damages period to existing CH customers and CH made 89% its sales during that period to Super Lighting's existing customers. *Id.* At trial, CH's damages expert agreed that the parties "sell to the same types of customers and the same categories of customers over the entire damages period." *Id.* Super Lighting and CH initially agreed that Super Lighting's witnesses attributed those lost sales to CH's ability to undercut Super Lighting. *Id.* at 7 ("Multiple Super Lighting witnesses confirmed that they had lost sales to CH due to CH's predatory pricing. . . . And the reason CH could charge so little was plain: because CH was improperly using Super Lighting's inventions without being burdened by Super Lighting's cost for research and development."); *id.* at 10 ("CH was able to undercut Super Lighting's sales with lower prices."); ECF No. 246 at 3–4. Plaintiffs argued that CH had the pricing flexibility because it was not burdened with the cost of research and development (R&D). ECF No. 234 at 10. In opposition, CH contends that Plaintiffs have not provided any substantive analysis that "Defendants' prices are lower *because* their products incorporate the patented features." ECF No. 246 at 4. On that point, the Court agrees with Defendants.

In reply, Plaintiffs reversed position and argued that "CH and Super Lighting's products are comparably priced over the damages period." ECF No. 253 at 2. Plaintiffs further averred that because customers purchased comparably priced products from both Super Lighting and CH, "pricing is not the only demand drivers for customers." *Id.* at 2–3. The reply then retreated to Plaintiff's opening position: if CH's prices are lower, it is only because CH was not burdened with R&D costs. *Id.* at 3. This inconsistency regarding this predatory pricing point certainly does not help Plaintiffs surmount their burden further undermines Plaintiffs' "causal nexus" position. *See* ECF No. 279 at 58:19–59:23.

33

Second, Super Lighting argues that CH's pricing scheme resulted in a decline of Super Lighting's gross margins over time—from $0.61 per unit during the damages period to $0.41 per unit in 2021. ECF No. 234 at 10. Defendants contend that Plaintiffs offered no evidence that the presence of infringing features in the infringing products caused the margin erosion. ECF No. 246 at 5. Defendants cited testimony from its damages expert that he saw no evidence that the decrease in profit margin was attributable to CH's infringement. *Id.*

Third, Super Lighting also asserts that its market share decreased from 19% in 2018 to 11.7% in 2020. ECF No. 234 at 10. Plaintiffs contend that the loss (or potential loss) of sales and market share is "the very essence of irreparable harm." *Id.* (first citing *TEK Glob., S.R.L. v. Sealant Sys. Int'l*, 920 F.3d 777, 793 (Fed. Cir. 2019); then citing *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1151 (Fed. Cir. 2011); then citing *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001); and then citing *i4i*, 670 F. Supp. 2d at 600). Defendants assert that this reduction may be merely attributable to Defendants' lower prices. ECF No. 246 at 5. Yet, as the Court notes above, Plaintiffs credit those lower prices to CH's freeriding on Plaintiffs' innovation.

This Court follows *Apple IV* in holding "that competition between the patentee and the infringer, particularly direct competition, strongly militates toward a finding of irreparable harm." *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 653 (Fed. Cir. 2015) (hereinafter *Apple IV*). Plaintiffs and Defendants are clearly direct competitors and, as Plaintiffs suggest, maybe even archrivals. Given that, and the evidence of lost sales, lost profit margins, and lost market share, the Court is satisfied that competition with CH caused Plaintiffs irreparable harm. The Court must satisfy itself, however, that CH's infringing conduct, and not lawful competition, caused that harm. *Apple III*, 735 F.3d at 1361.

2.      Causal Nexus

To show a causal nexus between the harm that Super Lighting has suffered and CH's infringement, Super Lighting must show "some connection between the patented feature and demand for [the infringer's] products." *Id.* at 1364. "The purpose of the causal nexus requirement is to establish the link between the infringement and the harm, to ensure that there is 'some connection' between the harm alleged and the infringing acts." *Apple IV*, 809 F.3d at 640. Super Lighting has failed to illuminate the causal nexus here.

Plaintiffs characterize the patented features as follows:

- The '140 patent's claimed feature is "shock protection circuitry." *See* ECF No. 234 at 4, 9. Tao Jiang, Super Lighting's CEO, and Aiming Xiong, head of R&D at Super Lighting, testified that this "prevents installers of LED tube lamps from being electrically shock[ed] and therefore improves product safety." *Id.* at 13 (first citing ECF No. 237 at 77:9–14 (testimony of Tao Jiang), then citing ECF No. 237 at 118:2–7 (testimony of Aiming Xiong)).

- The '125 patent's claimed feature is a "new concept of affixing the flexibility printed circuit ('FPC') on the inside surface of the lamp tube." *Id.* (citing ECF No. 237 at 69:2–3 (testimony of Tao Jiang)). Plaintiffs contend that this new design "enables wider light emission angles, offers sleeker appearance, and prevents electric shock." *Id.* (citing ECF No. 237 at 71:6–21 (testimony of Tao Jiang)).

- The '540 patent's claimed feature is an expansion upon "'the '125 invention based upon the improved relationship between the components, including the glass and glueable FPC' to produce better workmanship and more beautiful products." *Id.* (quoting ECF No. 237 at 76:3–9 (testimony of Tao Jiang)).

35

Plaintiffs then argue that there is "some connection" between these features and consumer demand sufficient to evidence a causal nexus. ECF No. 253 at 4 (quoting *Apple III*, 735 F.3d at 1364); ECF No. 234 at 13–14. In doing so, Plaintiffs almost exclusively refer to trial testimony discussing consumers' interest in safety features:

- Obert's CEO, Ryan Lu, testified, in response to a question about why customers prefer Obert tubes, that "it definitely may help the user a lot by take [sic] advantage of the safety feature." ECF No. 237 at 152:21–153:5. He continued, "It save [sic] a lot of the installation time, and it keep [sic] the installer safe at all costs." *Id.*

- Super Lighting's sales director, Barry Qin, testified that Plaintiffs' lamp product is "the safest one in the market currently." ECF No. 238 at 172:25–173:5.

- Jun Yang testified that customers "care" about the safety of LED lamps to the extent that CH Lighting "would need to obtain certifications related to safety, for example, the UL certification." ECF No. 237 at 205:19–23. And those certifications seemingly implicate measures to deal with electrical shocks. *Id.* at 205:24–206:3. (But, as CH Lighting notes, "Plaintiffs have never argued, and cannot argue, that practicing the '140 patent is necessary to obtain UL certification." ECF No. 246 at 8 n.3.)

- Jack Jiang testified that it was "absolutely correct" that the safety of LED tube lamps is an "important thing that customers care about." ECF No. 237 at 225:4–7.

The parties debate whether this evidence establishes a sufficient connection between the patented features and consumer demand, CH Lighting relying on *Apple III* and Plaintiffs relying on *Apple IV*. *See* ECF No. 246 at 7; ECF No. 253 at 4. In the former opinion, the plaintiff submitted evidence that ease-of-use was important to smartphone consumers but the lower court

deemed that evidence "too general" where the patented feature—tap-to-zoom—was "very specific." *Apple, Inc. v. Samsung Elecs. Co.*, 909 F. Supp. 2d 1147, 1155 (N.D. Cal. 2012).

> A consumer may want a phone that is easy to use, but this does not establish that a tap-to-zoom feature, for example, or any given type of gesture, is a driver of consumer demand. Thus, Apple's evidence of a survey showing the importance of ease of use as a general matter . . . does not establish that infringement of any of Apple's *patents* caused any harm that Apple has experienced. To establish the required nexus, Apple must make a showing specific to each patented feature. Many factors go into making a product easy to use, but the features for which Apple is asserting patent protection are very specific.

*Id.* The Federal Circuit agreed. *See Apple III*, 735 F.3d at 1367 ("The district court was thus correct in concluding that Apple's evidence of ease of use, although relevant, was too general, standing alone, to establish a causal nexus."). The evidence that consumers care about shock protection is, in CH's opinion, too general here where the '140 patent, for example, is directed to a specific shock protection circuit. *See* ECF No. 246 at 7–8.

In reply, Plaintiffs cling to *Apple IV*'s statement that the "causal nexus" inquiry is a "flexible one." ECF No. 253 at 1; ECF No. 279 at 33:3–6. The *Apple IV* court held that a plaintiff could make out a causal nexus with "evidence that a patented feature is one of several features that cause consumers to make their purchasing decisions." *Apple IV*, 809 F.3d at 642 (quoting *Apple III*, 735 F.3d at 1364). Plaintiffs allege the "the prevention of electric shocks" is just such a feature. ECF No. 253 at 4. Yet that identifies the patented feature at a higher level of generality than Plaintiffs characterize it elsewhere. *See, e.g.*, ECF No. 234 at 4 (describing how circuitry embodies the '140 patent).

*Apple III* cautions against such overgeneralizations. Again, the *Apple III* opinion affirmed that a plaintiff must show that the patented feature *in particular* drives demand for the accused product. The *Apple IV* opinion, on the other hand, merely clarified that establishing a causal

nexus does not require the plaintiff to prove that the patented feature is the exclusive driver of demand for the accused product; a showing that the patented feature "impacts customers' purchasing decisions" will suffice. 809 F.3d at 641. That customers care about safety and shock protection generally is, as CH Lighting concedes, "uncontroversial." *See* ECF No. 246 at 8 & n.3. CH Lighting's challenge, rather, turns on the absence of record evidence showing that customers care about shock protection *particular to the patented features*. The Court finds this argument persuasive. Just as the *Apple III* plaintiffs failed to adduce evidence specific to the tap-to-zoom feature, Plaintiffs have not cited evidence of customer demand specific to that degree or category of shock protection attributable to the '140 patent's claimed circuit.[10]

Plaintiffs, of course, disagree. Their most compelling evidence is Mr. Lu's testimony, elicited in response to a question about why customers prefer Obert lamp tubes, that it "may help the end user a lot by take advantage of the safety feature and the double-ended Type B tubes." ECF No. 253 at 4–5. Unless the Court construes Mr. Lu's recitation of "the safety feature" as a reference to the claimed circuitry of the '140 patent, this testimony is too general. Plaintiffs' counsel did not seek to clarify what Mr. Lu meant by "safety feature." And immediate context offers little support; this answer was not elicited amidst a conversation about shock protection circuitry. Adopting such a construction would treat Plaintiffs, the side bearing the burden here, too generously. Even if it ventured to accept the construction, the Court is dubious of the reliability of this testimony because it is self-serving—Mr. Lu is Obert's CEO—and unsupported by other admitted evidence. *See Rest. Law Ctr. v. United States DOL*, No. 1:21-CV-1106-RP, 2022 U.S. Dist. LEXIS 30368, at *12 (W.D. Tex. Feb. 22, 2022) ("The Court declines to rely on

---

[10] As opposed to shock protection from a noninfringing component. For example, Plaintiffs' technical expert testified that prior art LED tube lamps with UL certification would likely have had shock protection features. ECF No. 237 at 195:1–7.

such speculative and self-serving testimony to make a finding of irreparable harm."); *see* ECF No. 279 at 60:25–61:6 (criticizing the testimony Plaintiffs rely on because it comes from self-interested, non-expert witnesses).

Plaintiffs focused on the '140 patented feature, preserving little space to elaborate on the causal nexus relevant to the '125 and '540 patented features. What evidence Plaintiffs offer fails show a casual nexus.

For the foregoing reasons, the Court concludes that Plaintiffs have not established a causal nexus or, it follows, any irreparable injury justifying a permanent injunction. In addition, Plaintiffs have tied the next two *eBay* factors to the existence of an irreparable injury, so Plaintiffs have likewise failed to satisfy those factors. *See* ECF No. 234 at 15 ("The inadequacy of remedies at law is closely related to irreparable harm, and the two can be analyzed together."); *id.* at 16 (relying on the harm to Super Lighting). Failing these, Plaintiffs have not shown their entitlement to a permanent injunction.

## V. PRE- AND POST-JUDGMENT INTERESTS AND BILL OF COSTS

Briefing on Plaintiffs' Motion for Entry of Judgment, ECF No. 242, included requests for prejudgment and post-judgment. *See* ECF No. 242 at 4. The Court will grant both.

A damages award should provide "complete compensation," *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655 (1983), including "a reasonable royalty for the use made of the invention by the infringer, together with interest and costs." 35 U.S.C. § 284. "The purpose of prejudgment interest is to place the patentee in as good a position as he would have been had the infringer paid a reasonable royalty rather than infringe." *SSL Servs., LLC v. Citrix Sys., Inc.*, 769 F.3d 1073, 1094 (Fed. Cir. 2014). "The award of pre-judgment interest is the rule, not the exception." *Energy Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1358 (Fed. Cir. 2012). But Section 284 does not "requir[e] the award of prejudgment interest

whenever infringement is found." *Devex*, 461 U.S. at 655–56. The Court sees no reason to deviate from the rule here—and Defendants give it none. But, to be clear, prejudgment interest should only be awarded on the Jury's damages award—not on any enhancement thereto. *See Underwater Devices Inc. v. Morrison-Knudsen Co.*, 717 F.2d 1380, 1389 (Fed. Cir. 1983), *overruled on other grounds*, *In re Seagate Tech., LLC*, 497 F.3d 1360 (Fed. Cir. 2007) ("[W]e hold that prejudgment interest can only be applied to the primary or actual damage portion and not to the punitive or enhanced portion."); *see also Beatrice Foods Co. v. New England Printing & Lithographing Co.*, 923 F.2d 1576, 1580 (Fed. Cir. 1991) (discussing *Underwater Devices* holding).

The parties also vigorously dispute what interest rate should be applied. "The rate of prejudgment interest and whether it should be compounded or uncompounded are matters left largely to the discretion of the district court." *Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 969 (Fed. Cir. 1986). When exercising that discretion, the Court recognizes the purpose of prejudgment interest is to compensate the patent owner for infringement. *Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*, 757 Fed. Appx. 974, 2017 WL 1716589, at *4 (E.D. Tex. 2017). The Court will not adopt of the prime rate, finding that "[t]he T-Bill rate is well-accepted in federal courts and is a reasonable method of placing [Plaintiffs] in a position of where [they] would have been had there been no infringement by [Defendants]." *VLSI Tech. LLC v. Intel Corp.*, No. 6:21-CV-57-ADA, 2022 U.S. Dist. LEXIS 83985, at *7 (W.D. Tex. Apr. 21, 2022). "It is well within the Court's discretion to apply the T-Bill rate." *Id.* (citing *Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, 809 F. App'x 965, 977 (Fed. Cir. 2020)). So, the rate applied should be the average T-Bill rate, compounded annually, from the issue date of the '140

patent, which the Jury heard was the date of the hypothetical negotiation, to the date of the Court's forthcoming final judgment. *See* ECF No. 226 at 28.

The parties do not dispute that 28 U.S.C. § 1961 controls what interest rate should be applied for post-judgment interest. *Compare* ECF No. 249 at 7, *with* ECF No. 260 at 2. Accordingly, the Court awards post-judgment interest at the statutory rate, compounded annually, starting from the date of the Court's forthcoming final judgment until the date of payment. Post-judgment interest will apply to the total award including damages found by the jury, prejudgment interest applied to that award, and the enhanced damages award. *See Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*, No. 2:15-CV-00011-RSP, 2018 WL 2149736, at *14 (E.D. Tex. May 10, 2018), *vacated on other grounds*, 955 F.3d 1317 (Fed. Cir. 2020).

As a final matter, the briefing on the Motion for Entry of Judgment also included disputes as to Plaintiffs' Bill of Costs. *See* ECF No. 268. The parties subsequently came to an agreement on that Bill, ECF No. 278, and the Court will enter that agreed Bill of Costs promptly after entering judgment.

## VI. CONCLUSION

It is therefore **ORDERED**

- Plaintiffs' Motion for Enhancement of Damages Under 35 U.S.C. § 284, ECF No. 233, is **GRANTED-IN-PART**;

- Plaintiffs' Motion for Exceptional Case and Attorney Fees, ECF No. 241, is **DENIED**;

- Plaintiffs' Motion for Permanent Injunction, ECF No. 234, is **DENIED**.

It is further **ORDERED** that Plaintiffs' Motion for Entry of Judgment, ECF No. 242, is **HELD IN ABEYANCE** pending the parties' resolution of the precise dollar amount of

enhancement the Court has ordered. The parties are instructed to: meet and confer regarding the dollar amount of enhancement the Court ordered above; and jointly draft a proposed order of judgment consistent with the rulings above, to be sent to the Court by July 28, 2022, on which date the Court will enter judgment.

SIGNED this 21st day of July, 2022.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE